ELIZABETH C. PRITZKER (SBN: 146267)
JONATHAN K. LEVINE (SBN: 220289)
BETHANY L. CARACUZZO (SBN: 190687)
SHIHO YAMAMOTO (SBN: 264741)
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
Email: ecp@pritzkerlevine.com;
      jkl@pritzkerlevine.com;
      bc@pritzkerlevine.com;
      sy@pritzkerlevine.com

Attorneys for Plaintiffs Justine Hartman and Afure Jemerigbe

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUSTINE HARTMAN and AFURE JEMERIGBE, on behalf of themselves and all others similarly situated,<br><br>               Plaintiffs,<br><br>v.<br><br>NATIONAL COLLEGIATE ATHLETIC ASSOCIATION; PACIFIC-12 CONFERENCE; THE BIG TEN CONFERENCE, INC.; THE BIG TWELVE CONFERENCE, INC.; SOUTH-EASTERN CONFERENCE; ATLANTIC COAST CONFERENCE; THE AMERICAN ATHLETIC CONFERENCE; WESTERN ATHLETIC CONFERENCE; CONFERENCE USA; MID-AMERICAN CONFERENCE; MOUNTAIN WEST CONFERENCE; and SUN BELT CONFERENCE,<br><br>               Defendants. | Case No:<br><br>**COMPLAINT**<br><br>**CLASS ACTION**<br><br><br>**DEMAND FOR JURY TRIAL** |

- 1 -

Plaintiffs Justine Hartman and Afure Jemerigbe ("Plaintiffs"), by their undersigned attorneys, hereby allege as follows:

## INTRODUCTION

1.      Plaintiffs, on behalf of themselves and all others similarly situated, bring class action claims against Defendant National Collegiate Athletic Association ("NCAA") and five of the most powerful members of the NCAA, the so-called "Power Conferences," which include Defendants Pacific-12 Conference, The Big Ten Conference, Inc., The Big Twelve Conference, Inc., Southeastern Conference, and Atlantic Coast Conference (collectively referred to herein as the "Power Conference Defendants"), and six other NCAA member conferences, Defendants The American Athletic Conference, Conference USA, Mid-American Conference, Mountain West Conference, Sun Belt Conference and Western Athletic Conference. Collectively, the Conferences are referred to herein as the "Conference Defendants."

2.      This case is about Defendants' unlawful restraint of trade in the labor market for NCAA Division I women's basketball player services.

3.      Plaintiffs Hartman and Jemerigbe are current and former Division I collegiate athletes for the Golden Bears, the nickname for the University of California - Berkeley women's basketball team. Plaintiffs, and the class members they seek to represent, work and perform for their colleges and universities. In exchange, schools pay the athletes with athletic scholarships knows as "grants-in-aid."

4.      The NCAA and its members have unlawfully agreed that no college will pay an athlete any amount her work that exceeds the value of a grant-in-aid, and have agreed that the allowed grant-in-aid does not compensate for the full cost of attendance.

5.      Defendants readily admit the existence of this restraint on trade. The restraint is expressly memorialized in the NCAA Bylaws. And, Defendants have ample power to enforce their restraint. They collectively share "monopsony" power over college athletics, including women's basketball. The NCAA and its members are

"the only game in town" when it comes to compensating Plaintiffs and similarly situated collegiate athletes for their services.  In enacting the challenged restraint, the NCAA and its members have the ultimate power to artificially depress compensation to college athletes.  Top-tier athletes such as Plaintiffs and the class members they seek to represent have no reasonably close alternative.  The labor market for NCAA Division I women's basketball player services, instead, is a classic "take it or leave it" market, which is the *sine qua non* for a monopsony.

6.      As described in this Complaint, the NCAA and the Conference Defendants have agreed that Division I basketball players may only receive payments that the NCAA approves.   The primary form of payment is an athletic scholarship, known as a "grant-in-aid" or "GIA".  In violation of the Sherman Act, Defendants have agreed to cap the value of a grant-in-aid at an amount below what a Division I women's basketball player would receive for her services in a competitive market, and at an amount below what it costs to attend school.

7.      The value of a grant-in-aid is often several thousand dollars below the actual cost of attending a school (the "Cost of Attendance," an amount published by each school).  In the highly competitive marketplace of Division I women's basketball, every player unquestionably would receive a grant-in-aid that actually covers the Cost of Attendance.  Indeed, each of the Conference Defendants has stated that if it was not bound by the collusive agreement among themselves and their co-conspirators that make up Division I, it would implement such an increase. Moreover, if collusion among conferences were eliminated, every women's collegiate basketball player likely would receive further *additional* compensation above the bare Cost of Attendance.

8.      Plaintiffs, on behalf of women's Division I basketball players who received grants-in-aid at any time between March 5, 2010 (four years prior to the date of the first-filed complaint in the consolidated class action multi-district litigation entitled *In Re National Collegiate Athletic Grain-in-Aid Cap Antitrust Litigatio*n, 14-md-02541-CW) and the present, seek two specific remedies.  First, Plaintiffs seek an

injunction that enjoins Defendants from maintaining and abiding by the present NCAA Bylaw that limits financial aid to the presently-defined GIA.  Second, Plaintiffs seek an award of damages for themselves and all other similarly-situated persons for the difference between the grant-in-aid awarded and the Cost of Attendance.   The requested injunction, in particular, would remove market restrictions and result in a more competitive marketplace for the services of Division I women's basketball players.

9.     There are reasonable and less restrictive alternatives to Defendants' anticompetitive practices. For example, the Conference Defendants could be allowed to compete among themselves and against their co-conspirator conferences as to the financial aid terms that conference members make available to college women's basketball players.   Such incremental competition would enable every school and conference to make its own independent decision on the level of financial aid it wishes to make available to its collegiate athletes.

10.     The NCAA has repeatedly acknowledged that the capped grant-in-aid is insufficient to meet even the basic economic needs of college athletes.   NCAA President Mark Emmert stated in December 2013 that "we've been working on that for 2-1/2 years. They were talking about that long before I showed up. We don't need a lawsuit to do the right thing. That's important for people to know."[1] In fact, the NCAA created the issue in the first place, by first imposing a collusive cap on grants-in-aid in 1956, and then by removing a Cost of Attendance stipend in 1973. Ever since, the NCAA has periodically been "working" on the issue, with no significant changes to the capped grant-in-aid limitations. Despite the NCAA's public comments concerning the needs of college athletes, the collusive cap on grants-in-aid remains in place.

11.     At a typical NCAA member institution, the allowable costs covered by an athletics "grant-in-aid" are several thousand dollars short, per year, per athlete,

---

[1]    http://www.usatoday.com/story/sports/college/2013/12/11/mark-emmert-ncaa-lawsuit-ed-obannon-ea-sports-collegiate-licensing-co/3987907/.

compared to what it actually costs a college athlete to attend school. The NCAA quite accurately calls the larger cost number the "Cost of Attendance," which the NCAA defines in its rules as "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution." Through collusive agreement among all Division I members of the NCAA, the artificial cap on athletics financial aid is set below the amount of the full Cost of Attendance that any student would incur to attend the relevant colleges and universities. This agreement is enshrined in the Bylaws of the NCAA which serve, in essence, as the contract (as in the Sherman Act's prohibition on any contract, combination, or conspiracy in restraint of trade) among the conspirators, making the agreement explicit, and authorizing various cartel policing measures against any school that violates the price-fixing agreement. The NCAA then enforces this agreement through threat of sanctions, ranging from loss of the ability to compete (through loss of scholarships) all the way to a full collective boycott of all other members known colloquially as "the death penalty." The NCAA thus arbitrarily restricts athletes' financial aid to amounts that are less than the athletes would receive in a competitive market.

12. Additionally, the NCAA restricts the value of the full scholarship to a level of compensation that is at or below the poverty level for many collegiate athletes at a time when, according to President of IMG College, Ben Sutton, 'college sport is indisputably on fire' in terms of its capacity to generate revenue and television ratings. The same can be said for "full" scholarship athletes in Division I women's college basketball.[2]

---

[2] According to Associated Press reports, the ESPN-televised women's basketball championship game between the University of Connecticut (UConn) and Notre Dame drew the highest television rating for women's basketball in a decade. *See* http://www.theepochtimes.com/n3/ 612021-ncaa-womens-final-gets-high-tv-rating/.

*(Footnote continued)*

COMPLAINT

13.     Denying Division I women's basketball players the benefits of economic competition through the grant-in-aid cap has imposed a lower standard of living and significant hardships on many players.  Players have much less time and ability to earn money through part-time jobs than do other students.  These athletes also are more likely to incur substantial travel costs to attend school than other students.  The NCAA has exacerbated the effects of the grant-in-aid cap by collusively restricting the ability of Plaintiffs and class members to earn extra money through part-time work.

14.     There is no reasonable justification or legal defense for the athletics grant-in-aid cap.  The athletics grant-in-aid cap is not necessary to promote any interest in preserving NCAA "amateurism."  Rather, the NCAA's athletics grant-in-aid cap is simply an unjustifiable and collusive cost containment mechanism that enables Defendants to preserve more of the benefits of their lucrative enterprise for themselves.

15.     After the NCCA's own Board of Governors recently approved a proposal to allow so-called "stipends" to cover the gap between the capped grants-in-aid and the true Cost of Attendance as being fully compatible with the principles of "amateurism" as the NCCA defines them, the NCAA's members overrode the approval and rejected it.  The NCAA stated that members rejected the proposal because of the desire to control costs, and not for a pro-competitive objective.  However, under the antitrust laws, a defendant's desire to save costs – and thereby increase profits at the expense of other participants in the market – is not a legitimate justification for the grant-in-aid cap or any other horizontal agreement to restrict price or output.

16.     Defendants historically created, structured and maintained the athletics grant-in-aid program not as a devise to increase consumer welfare or to increase the volume or quality of their output.  The athletics grant-in-aid cap was not designed to boost demand for Defendants' product, meaning game attendance or television viewership.  Instead, Defendants designed the athletics grant-in-aid, from its inception,

as a means to evade the requirements of labor and workers' compensation laws, and as an aid to their risk management and cost containment.

17.     Defendants' agreed-upon rules impose and artificial and unlawful ceiling on the remuneration that players may receive for their services as collegiate women's basketball players.  Such agreements to price-fix player's compensation, and to boycott institutions or players who refuse to comply with Defendants' price-fixing agreement, are per se illegal acts under Section 1 of the Sherman Act, 15 U.S.C. § 1.  Defendants' actions also constitute an unreasonable restraint of trade under the rule of reason, whether under a "quick look" or full-blown rule of reason analysis.

18.     As a result of Defendants' anticompetitive agreements, Plaintiffs and other similarly-situated former, current and future Division I women's basketball players in the relevant market described below have received and/or will receive less remuneration for their playing services than they would receive in a competitive market. Plaintiffs and class members request this Court's assistance, to require Defendants to comply with the law and to recover from Defendants actual and treble damages for the financial harm that Plaintiffs and class members have suffered as a result of Defendants' anticompetitive actions.

### THE PARTIES

**A.     Plaintiffs**

19.     **Plaintiff Justine Hartman**, an individual, is a resident of Berkeley, California, and a current student athlete at the University of California – Berkeley ("UCB"), where she currently participates as a member (jersey number - 40) of the UCB Golden Bears women's basketball team.  UCB is a Division I member of the NCAA and the Pac 12 Conference.

20.     Plaintiff Hartman was a heavily recruited women's basketball player from Whittier, California.  In high school, Hartman led the 2010-11 Brea Olinda High School women's basketball team to national prominence (with a mid-season No. 1 ranking and season ending No. 5 ranking).  Harman earned spots on the 2010-11

McDonald's and WCBA High School All-American teams, and was named MVP at Nike Tournament of Champions, leading her high school women's basketball team to the tournament title.

21. Plaintiff Hartman was ranked the No. 7 recruit in the nation and the No. 2 post player by ESPN-W HoopGurlz. At the time she was offered a full athletics-based grant-in-aid to play women's basketball at the University of California Berkeley, in 2011, Hartman was the highest-ranked recruit ever secured by the UCB women's basketball program.

22. Plaintiff Hartman has maintained and played a position (Forward) on the UCB Golden Bears women's basketball team for each academic year in 2011-12, 2012-13, 2013-14 and 2014-15. Pursuant to NCAA and conference rules, the athletics-based grant-in-aid remuneration provided to Hartman during each year of her participation with the UCB Golden Bears women's basketball team has been equal to, and no more than, the highest amount permitted under the artificial restraints imposed on athlete compensation by Defendants. Several other NCAA Division I member institutions offered Hartman a full grant-in-aid to play women's basketball, the amounts of which also were capped by rules imposed by Defendants.

23. For each academic year in 2011-12, 2012-13, 2013-14 and 2014-15, Plaintiff Hartman has been offered, and has accepted, a full athletic grant-in-aid to attend UCB. Hartman's full grant-in-aid consists of: (a) tuition and registration fees; (b) required course-related fees; (c) room; (d) meals; and (e) required textbooks.

24. Plaintiff Hartman has been and remains a full-time student in good standing at UCB, and has at all times fulfilled all athletic and academic requirements to maintain her athletic scholarship.

25. Currently, Hartman lives off campus during the academic year, as she has done in prior academic years.

26. It is not feasible for Plaintiff Hartman to work during the academic year, given her academic and athletic obligations.

27.   For each academic year, 2011-12, 2012-13, 2013-14 and 2014-15, the athletic grant-in-aid money Plaintiff Hartman received from UCB has been substantially less than the full Cost of Attendance.

28.   As a direct result of Defendants' violation of federal antitrust and other laws described herein, Plaintiff Hartman was injured in her business or property in an amount to be proven at trial.

29.   **Plaintiff Afure Jemerigbe**, an individual, is a resident of Berkeley, California, and a former starting player (in the position of Guard) for the UCB Golden Bears women's basketball team, from 2010 to 2014.

30.   Plaintiff Jemerigbe was a heavily-recruited 2-letter star athlete from Stockton, California.  In high school, Jemerigbe was named a 2010 McDonald's All-American athlete, a 2010 WCBA All-American athlete and a 2010 Parade Magazine Second Team All-American athlete.  Jemerigbe also participated in the 2010 USA Basketball Women's U-18 National Team trials.  In addition to her athletic success, Jemerigbe was member of the St. Mary's High School honor roll for three years (sophomore through senior years).

31.   Plaintiff Jemerigbe was recruited by several NCAA Division I and Power Conference member institutions.  In 2010, Jemerigbe was offered and accepted a full athletics-based grant-in-aid to play women's basketball at UCB.  Jemerigbe played in over one hundred games while at UCB.  After 14 starts in her sophomore year (2011-12), Jemerigbe started all 36 games as a junior in 2012-13, and started all 32 games as a senior in 2013-14.  Jemerigbe was the third leading scorer for the UCB Golden Bears in 2013-14, with 12.1 points and 4.2 rebounds per game.

32.   Plaintiff Jemerigbe accepted an athletic scholarship, "a full Women's Basketball Grant-in-Aid," to attend UCB beginning Fall 2010.  Jemerigbe's full grant-in-aid consisted of:  (a) tuition and registration fees; (b) required course-related fees; (c) room; (d) meals; and (e) required textbooks.

33.    Pursuant to NCAA and conference rules, the athletics-based grant-in-aid remuneration provided to Jemerigbe during each year of her participation with the UCB Golden Bears women's basketball team has been equal to, and no more than, the highest amount permitted under the artificial restraints imposed on athlete compensation by Defendants.  Prior to attending UCB, several other NCAA Division I member institutions offered Jemerigbe a full grant-in-aid to play women's basketball, the amounts of which also were capped by rules imposed by Defendants.

34.    For each academic year in 2010-11, 2011-12, 2012-13 and 2013-14, Plaintiff Jemerigbe was a full-time student in good standing at UCB.  Jemerigbe at all times fulfilled all athletic and academic requirements to maintain her athletic scholarship.    It was not feasible for Jemerigbe to work during the academic year, given her academic and athletic obligations.

35.    For each academic year, 2010-11, 2011-12, 2012-13 and 2013-14, the athletic grant-in-aid money Plaintiff Jemerigbe received from UCB was substantially less than the full Cost of Attendance.

36.    Plaintiff Jemerigbe received her bachelor's degree in Social Work and graduated from UCB in May 2014.  Following graduation from UCB, Jemerigbe traveled to Caceres, Spain to play women's basketball for the professional team, Club Baloncesto Al-Qazeres.  Jemerigbe returned to the United States in November 2014, and currently works in the Bay Area.

37.    As a direct result of Defendants' violation of federal antitrust and other laws described herein, Plaintiff Jemerigbe was injured in her business or property in an amount to be proven at trial.

**B.    Defendants**

38.    Defendant the **NCAA** is an unincorporated not-for-profit educational organization founded in 1906 with its principal place of business in Indianapolis, Indiana. The NCAA states that it "is the organization through which the colleges and universities of the nation speak and act on athletic matters at the national level." It

comprises more than 1,200 colleges, universities, and athletic conferences throughout the United States, including the Conference Defendants.

39.     Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of college sports. The NCAA Constitution and Bylaws were adopted by, and may be amended by, votes of the member institutions. Thus, the rules in the NCAA Constitution and Bylaws constitute horizontal agreements between the NCAA and its members and between members of the NCAA. With respect to the Division I "grant-in-aid" they constitute a series of annually renewed, horizontal price-fixing agreements.

40.     The NCAA includes 1,102 active member schools, and these schools are organized into three Divisions. Division I includes 351 schools, including 242 with women's basketball programs.  Divisions II and III include schools with much less extensive or no women's basketball programs. As a practical matter, any academic institution that wishes to participate in any meaningful way in the highest and most popular levels of women's basketball must maintain membership in the NCAA and abide by the Division I rules and regulations promulgated by the NCAA and its members. There is no practical alternative to Division I NCAA membership for any academic institution that wishes to participate at the highest levels of college women's basketball.

41.     Because the NCAA and NCAA member institutions control the highest and most popular levels of college women's basketball, any individual who wishes to provide athletic services in exchange for the payment of full tuition for an undergraduate academic and athletic education must, by necessity, attend an NCAA Division I member institution. There are zero practical alternatives that can provide the unique combination of attributes offered by Division I NCAA women's basketball schools: (i) the ability to exchange athletics services for the payment of educational costs plus room and board; (ii) high quality academic educational services; (iii) top-of-the-line training facilities; (iv) high quality coaches that will best be able to launch

players to professional careers; (v) national publicity through nationwide scheduling of games and nationwide broadcasting contracts; and (vi) competition at the highest level of college women's basketball by competing for the same institution where one is also a student.

42.     There is no major college women's basketball program in the United States that is not a NCAA Division I member, abiding by the NCAA rules. Division I NCAA member institutions are by far the largest purchasers of student women's basketball labor in the United States, and the NCAA and its Division I member institutions have monopsony power over the market for college women's basketball players.

43.     The NCAA maintains a staff of over 300 individuals at its headquarters, and has an $800 million dollar annual budget.[3]

44.     During the Class Period Defendant NCAA participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs and class members, and will continue to do so unless enjoined.

45.     Defendant **Pacific-12 Conference ("Pac 12")** is an unincorporated association with its principal place of business in this District located at 360 3rd Street, 3rd Floor San Francisco, CA 94107 (as of August 2014).  The Pac 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2011 IRS Form 990, the most recent one publicly available, the Pac 12 identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that for its fiscal year ending June 30, 2012, it obtained gross revenues of $175,898,248. The Pac 12's "2013-14 Handbook" states that the Pac 12 was organized for purposes including: "[t]o provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics

---

[3]     http://www.bloomberg.com/consumer-spending/2012-03-21/the-real-cost-of-march-madness.html# slide5.

Association ('NCAA') in accordance with the principles, policies, constitution and bylaws of the NCAA" and "[t]o assist its members in funding and promoting their intercollegiate athletics programs."

46.     For the purpose of college women's basketball, the Pac 12's current members are the following twelve institutions: University of Arizona, Arizona State University, UCB, University of Colorado, University of Oregon, Oregon State University, Stanford University, University of California, Los Angeles ("UCLA"), University of Southern California ("USC"), University of Utah, University of Washington, and Washington State University. All of the Pac 12's women's basketball members are also members of the NCAA's Division I, Women's Basketball Subdivision.

47.     During the Class Period Defendant Pac 12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged Plaintiffs and class members, and will continue to do so unless enjoined.

48.     Defendant **The Big Ten Conference, Inc. (the "Big Ten")** is a nonprofit Delaware corporation with its principal place of business at 5440 Park Place, Rosemont, Illinois 60018. The Big Ten is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2011 IRS Form 990, the most recent one publicly available, the Big Ten identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that, for its fiscal year ending June 30, 2012, it obtained gross revenue of $315,479,314. In its 2010 IRS Form 990, the Big Ten identified its mission as "to promote and regulate inter-collegiate athletic programs, encourage sound academic principles, and foster collegiality among our eleven member institutions, all of which are prestigious, non-profit educational institutions."

49.     For the purpose of college women's basketball, the Big Ten's members are the following fourteen institutions: University of Illinois at Urbana-Champaign, Indiana University, University of Iowa, University of Maryland (as of July 1, 2014),

University of Michigan, Michigan State University, University of Minnesota, University of Nebraska-Lincoln, Northwestern University, Ohio State University, Pennsylvania State University, Purdue University, Rutgers University (as of July 1, 2014) and University of Wisconsin-Madison. All of the Big Ten's women's basketball members are members of the NCAA's Division I Women's Basketball Subdivision.

50.    During the Class Period Defendant Big Ten participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

51.    Defendant **The Big Twelve Conference, Inc. ("Big 12")** is a nonprofit Delaware corporation with its principal place of business at 400 East John Carpenter Freeway, Irving, Texas 75062. The Big 12 is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2011 IRS Form 990, the most recent one publicly available, the Big 12 stated that it was formed in 1996, is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that for its fiscal year ending June 20, 2012, it obtained gross revenue of $159,510,4398. The Big 12 further stated in its IRS filing that its mission is to "organize, promote and administer intercollegiate athletics among its member institutions" and to "optimize revenues and provide supporting service sompatible [sic] with both academic and competitive excellence."

52.    For the purpose of college women's basketball, the Big 12's current members are the following ten institutions: Baylor University, Iowa State University, University of Kansas, Kansas State University, University of Oklahoma, Oklahoma State University, University of Texas at Austin, Texas Christian University, Texas Tech University, and West Virginia University. All of the Big 12's women's basketball members are members of the NCAA's Division I, Women's Basketball Subdivision.

53.    During the Class Period Defendant Big 12 participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

- 14 -

54. **Defendant Southeastern Conference ("SEC")** is an unincorporated association with its principal place of business at 2201 Richard Arrington Boulevard North, Birmingham, AL 35203-1103. The SEC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I. In its 2011 IRS Form 990, the SEC identified itself as a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and stated that for its fiscal year ending August 31, 2012, it obtained revenues of $273,063,526. It further identified its mission is to "promote and administer intercollegiate athletic competition among its 14 member institutions located in the Southeastern United States."

55. For the purpose of college women's basketball, the SEC's current members are the following fourteen institutions: University of Florida, University of Georgia, University of Kentucky, University of Missouri, University of South Carolina, University of Tennessee, Vanderbilt University, University of Alabama, University of Arkansas, Auburn University, Louisiana State University, University of Mississippi, Mississippi State University, and Texas A&M University. All of the Southeastern Conference's women's basketball members are members of the NCAA's Division I, Women's Basketball Subdivision.

56. During the Class Period Defendant SEC participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

57. **Defendant Atlantic Coast Conference ("ACC")** is an unincorporated association with its principal place of business at 4512 Weybridge Lane, Greensboro, North Carolina 27407. The ACC is a multi-sport collegiate athletic conference and a formal "conference member" of Defendant NCAA's Division I. In its 2011 U.S. Internal Revenue Service ("IRS") Form 990, the most recent one publicly available, the ACC stated that it was formed in 1953, is a tax-exempt organization pursuant to section 501(c)(3) of the U.S. Internal Revenue Code, and that for its fiscal year ending June 30, 2012, it obtained gross revenue of $224,076,000. The ACC further stated in

its IRS filing that it "exists to promote and regulate inter-collegiate athletic programs for and among twelve member institutions, all of which are non-profit educational institutions." It also identified itself as a corporation in that IRS filing, although elsewhere it has identified itself as an unincorporated nonprofit association.

58.     For the purpose of college women's basketball, the following are current member institutions of the ACC:   Boston College, Clemson University, Duke University, Florida State University, Georgia Institute of Technology ("Georgia Tech"), University of Miami, University of Louisville (as of July 1, 2014), University of North Carolina at Chapel Hill, North Carolina State University, University of Pittsburgh, Syracuse University, University of Virginia, Virginia Polytechnical Institute and University ("Virginia Tech"), and Wake Forest University.  On July 1, 2014, the University of Maryland, College Park ("Maryland") departed the ACC to join the Big Ten Conference.  As the ACC stated in its 2012-13 annual report, the University of Notre Dame also "officially joined the ACC on July 1, 2013…Notre Dame will compete as a full member in all conference sponsored sports with the exception of football, which will play five games annually against league programs."

59.     Defendant ACC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in the Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

60.     Defendants Pac-12, Big Ten, Big 12, SEC and ACC are collectively referred to herein as the "Power Conference Defendants."

61.     **Defendant American Athletic Conference ("American")**, f/k/a The Big East Conference, is an incorporated association, whit its principal place of business located at 15 Park Row West, 3rd Floor, Providence, RI 02903.  American is a multi-sport athletic conference, and a formal "conference member" of Defendant NCAA's Division I.  From 2014-15 through the 2019-20 school years, American is expected to receive $20 million annually for both football and basketball through its contract with

ESPN. American also was rumored to be signing a deal with CBS for select basketball games that would pay American approximately $2 million per year.

62. For the purpose of college women's basketball, American includes the following member institutions: University of Central Florida, University of Cincinnati, University of Connecticut ("UConn"), University of Houston, University of Houston, University of Louisville, University of Memphis, Rutgers University, Southern Methodist University, University of Southern Florida, and Temple University. In July 2014, Tulane University, East Carolina University, and the University of Tulsa, all formerly members of Defendant Conference USA (described below), joined American.

63. Defendant American during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damages class members, and will continue to do so unless enjoined.

64. **Defendant Conference USA** is an incorporated association, with its principal place of business located at 5201 N. O'Connor Blvd., Irving, TX. Conference USA is a multi-sport athletic conference, and a formal "conference member" of Defendant NCAA's Division I. Conference USA has television deals with FOX and CBS, which includes rights to televise Conference USA college women's basketball games, worth $14 billion per year.

65. For the purpose of college women's basketball, Conference USA includes the following member institutions: University of North Carolina-Charlotte, Florida International University, Florida Atlantic University, Louisiana Tech University, Middle Tennessee State University, University of North Texas, Old Dominion University, University of Texas – San Antonio, Marshall University, Rice University, University of Southern Mississippi, UAB, the University of Texas-El Paso, and Western Kentucky University (as of July 1, 2014).

66. Defendant Conference USA during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

67.   **Defendant Mid-American Conference ("MAC")** is an incorporated association, with its principal place of business located at 24 Public Square, 15th Floor, and Cleveland, OH 44113-2214.  The MAC is a multi-sport athletic conference, and a formal "conference member" of Defendant NCAA's Division I.  In 2009, ESPN signed a multi-year deal with the MAC that provides for a minimum of 25 events annually to be produced and aired on an ESPN platform.   In February 2014, ESPN and MAC announced they had agreed to a deal to allow ESPN to launch a digital MAC Conference Channel.  ESPN regularly broadcasts college women's basketball games for the member institutions of the MAC, which include the following schools: University of Akron, Ball State University, Bowling Green State University, University of Buffalo, Central Michigan University, Eastern Michigan University, Kent State University, Miami (Ohio) University, Northern Illinois University, Ohio University, University of Toledo, University of Massachusetts, and Western Michigan University.

68.   Defendant MAC during the Class Period participate in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

69.   **Defendant Mountain West Conference ("MWC")** is an incorporated association with its principal place of business located at 10807 New Allegiance Drive, Suite 250, Colorado Springs, CO 80921.  MWC is a multi-sport athletic conference, and a formal conference member of Defendant NCAA's Division I.  For the purpose of college women's basketball, the MWC includes the following member institutions: Boise State University, California State University-Fresno, U.S. Air Force Academy, Colorado State University, San Diego State University, San Jose State University, University of New Mexico, University of Nevada-Las Vegas, University of Nevada-Reno, Utah State University, and University of Wyoming.

70.     Defendant MWC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in the Complaint, has thereby damaged class members, and will continue to do so unless enjoined.

71.     **Defendant Sun Belt Conference ("Sun Belt")** is an incorporated association, with its principal place of business located at 1500 Sugar Bowl Drive, New Orleans, LA 70112.  The Sun Belt is a multi-sport athletic conference, and a formal conference member of Defendant NCAA's Division I.  In 2011, the Sun Belt entered into a multi-year agreement with ESPN for broadcasting rights through the 2019-20 season.  The agreement took effect beginning in the 2012-13 academic year, expands the Sun Belt's national television exposure and makes ESPN the exclusive national cable and satellite provider for the Sun Belt.  Under the agreement, ESPN regularly broadcasts college women's basketball games for the member institutions of the Sun Belt, which include the following schools:  Arkansas State University, Appalachian University (as of July 1, 2014), Georgia Southern University (as of July 1, 2014), Georgia State University, University of Louisiana-Lafayette, University of Louisiana-Monroe, University of South Alabama, Texas State University, Troy University, University of Arkansas-Little Rock, and University of Texas-Arlington. On July 1, 2014, Western Kentucky University left the Sun Belt to join Conference USA.

72.     Defendant Sun Belt during the Class Period participated in the collusive restraint of trade and other violations of law alleged in the Complaint, and has thereby damaged class members, and will continue to do so unless enjoined.

73.     **Defendant Western Athletic Conference ("WAC")** is a nonprofit entity with its principle place of business at 9250 E. Costilla Avenue, Suite 300, Englewood, CO 80112.  The WAC is a multi-sport collegiate athletic conference, and a formal "conference member" of Defendant NCAA's Division I.

74.     In its 2012 IRS Form 990, the most recent one available for public inspection, the WAC stated that it is a tax-exempt organization pursuant to section

501(c)(3) of the U.S. Internal Revenue Code, and that, for its fiscal year ending June 30, 2013, it obtained gross revenues of $17,414,222. In a press release dated July 1, 2014, the WAC stated "[a]fter completing the 52nd year of intercollegiate competition, the Western Athletic Conference continues to evolve and feature some of the nation's best programs. One thing that remains unchanged is the persistent nature of the schools in the WAC to advance their programs to contend at the top levels of the NCAA." The WAC further stated that it "has experienced tremendous success over the years. In men's basketball, the WAC has sent at least two teams to the NCAA Tournament in 28 of the past 40 seasons… In women's basketball, the conference had has at least two teams qualify for the NCAA Tournament 10 times in 23 seasons… The WAC also sent teams to three BCS football bowl games since 2006." The WAC also represented in its 2012 IRS filing that it "incurs expenses…that insure that each of the schools and its entire athletic programs, including coaches, student-athletes, administrators and staff remain in compliance with bylaws and rules established by the NCAA."

75.     For purposes of women's basketball, the WAC includes the following member institutions:   California State University-Bakersfield, Chicago State University, Grand Canyon University, New Mexico State University, University of Missouri-Kansas City, University of Texas-Pan American, Utah Valley University, and Seattle University.

76.     Defendant WAC during the Class Period participated in the collusive restraint of trade and other violations of law alleged in this Complaint, has thereby damaged class members, and will continue to do so unless enjoined,

77.     Whenever in this Complaint Plaintiffs make any reference to any act, deed or transaction of a Defendant, the allegation means that the Defendant engaged in the act, deed, or transaction by or through its officers, directors, agent, employees, or representatives while they were actively engaged in the management, direction, control or transaction of the Defendant's business or affairs.

C.     **Co-Conspirators**

78.     Various other persons, firms, corporations, and entities have participated as unnamed co-conspirators with Defendants in the violations and conspiracy alleged herein, including the NCAA's Division I member schools and non-Defendant Division I conferences. In engaging in the offenses and violations alleged herein, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and other violations alleged herein.

79.     At all relevant times, each co-conspirator was an agent of Defendants and each of the remaining co-conspirators, and in doing the acts alleged herein, was acting within the course and scope of such agency. Defendants and each co-conspirator ratified and/or authorized the wrongful acts of Defendants and each of the other co-conspirators. Defendants and the co-conspirators, and each of them, are participants as aiders and abettors in the improper acts and transactions that are the subject of this action.

## JURISDICTION AND VENUE

80.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation), as this action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d), because this is a class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from any Defendant.  This Court also has supplemental subject matter jurisdiction with respect to pendent state law claims pursuant to 28 U.S.C. § 1367.

81.     Venue is proper in the District because Defendants reside, are found, and have agents in this District as provided in 28 U.S.C. § 1391(b) and (c) and in Section 4 of the Clayton Act, 15 U.S.C. § 15.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.  The athletics grant-in-aid cap

applies to college athletes who have competed, or presently do compete, for NCAA member institutions in this District.  NCAA sanctioned Division I athletic events regularly take place in this District, including regular-season women's basketball games played by local schools and NCAA postseason tournament women's basketball games.  Additionally, Plaintiffs Hartman and Jemerigbe, as well as numerous members of the proposed Class, reside in this District.

82.     This Court has personal jurisdiction over Defendants because, inter alia, Defendants: (a) transact business throughout the United States, including in this District; (b) participate in organizing intercollegiate athletic contests as well as licensing and selling merchandise and products, including television events such as women's basketball regular season and post-season tournament games, throughout the United States, including in this District; (c) have substantial contacts within the United States, including in this District; and (d) are engaged in illegal anticompetitive conduct directed at, and which has had the intended effect of causing injury to, persons residing in, located in, and/or doing business throughout the United States, including in this District.

83.     Additionally, NCAA Division I member schools are found within this District, such as the UCB and Stanford University, both of which are members of Defendant Pac-12.  Also located in this District are several schools that are members of co-conspirator NCAA conferences, specifically the University of San Francisco, St. Mary's College, Santa Clara University and San Jose State University.  The NCAA and Defendant Pac 12 also are headquartered within this District, in San Francisco, California.

84.     Additionally, California's population is the largest in the nation by a very wide margin.  The recruiting patterns of the Power Conference Defendants reflect this fact, as they continuously and systematically travel and communicate into California to recruit California women's basketball players.

85.    Moreover, in 2014, the NCAA conducted its Annual Convention in California.  The NCAA, the Power Conference Defendants, and other NCAA members expressly debated and discussed the subject matter detailed in this Complaint at that conference, and reinforced and ratified their agreements to not presently allow NCAA members to exceed the grant-in-aid cap up to the Cost of Attendance, and to not allow NCAA members to exceed the Cost of Attendance.

86.    **Intradistrict Assignment**: This action arises in Alameda County or San Francisco County because that is where a substantial part of the events that give rise to the claims occurred. The UCB campus is found within Alameda County. UCB fields at least 27 intercollegiate sports teams, including an NCAA Division I women's basketball team, which competes in the Pac 12. Plaintiffs Hartman and Jemerigbe, and other current and former UCB women's basketball players, have been subjected to the violations described herein, and current women's basketball players, such as Plaintiff Hartman, are subject to the continuing violations described herein. Pursuant to Civil Local Rule 3-2(d), this action should be assigned to the San Francisco Division or to the Oakland Division.

## THE RELEVANT MARKET

87.    The relevant market is the nationwide market for the labor of NCAA Division I women's basketball players in the United States (hereinafter, the "Division I Women's Basketball Labor Market").

88.    In this market, current and prospective college students compete for roster spots on Division I women's basketball teams.  NCAA Division I member institutions compete to obtain and retain the best Division I women basketball players by paying in-kind benefits, namely, Division I basketball scholarships, access to academic programs, access to training facilities, and instruction from premier coaches.  In some cases, the capped compensation includes pay in cash, through the provision of a housing and food allowance, but in all cases the amount of in-kind and cash compensation is strictly capped by means of the conspiracy alleged herein.

89.     NCAA rules currently permit the award of 15 full scholarships for women's Division I basketball teams.  Division I basketball programs (both men's and women's) compete at the highest level of college basketball.  Collectively, they generate millions of dollars in revenue from revenue streams including game attendance ticket revenue, TV contracts, corporate sponsorships, merchandise sales and licensing, and alumni contributions.

90.     The substantial revenues generated by Division I basketball programs enable Division I member institutions to provide superior coaching, playing and training facilities.

**A.     The Division I Women's Basketball Market is Distinct**

91.     The NCAA, the Conference Defendants, their co-conspirators, and the colleges and universities that compete in Division I Women's Basketball conferences sanction and sponsor college basketball games.  Those athletic contests involve teams comprised of players who are also receiving the higher education services of the colleges and universities for which they provide their athletic services.  The women basketball players that compete in Division I are elite athletes, the very best women's basketball players in the world in their age group.  Those elite player have no other options, other than in women's Division I basketball, where they can regularly complete against similarly elite competition.  Most such players are not eligible to compete as professionals in the Women's National Basketball Association ("WNBA").  The teams in the WNBA are parties to a collective bargaining agreement with the union that represents professional women's basketball players (the "WNBPA").  That agreement prohibits a basketball player from joining the WNBA until she is 22 years of age and has graduated from college.

92.     The association of the products of women's Division I basketball with college students competing as elite athletes is a unique feature that makes those products successful and distinguishes those products from other sporting events and other entertainment alternatives.  Because of the distinct commercial appeal of the

basketball played in women's Division I basketball, the NCAA and the colleges and universities in the relevant market generate substantial revenues by selling tickets to sporting events, selling broadcast rights to television and radio outlets and related licensing and concession activities.

93.     The television broadcast revenues attributable to women's Division I basketball teams dwarf those attributable to women's Division II or Division III basketball, or NAIA basketball,[4] demonstrating the marketplaces' recognition of women's Division I basketball as a distinct market.

94.     The Division I Women's Basketball Labor Market includes all of the colleges and universities in the NCAA's Division I that field women's Division I basketball teams, which the NCAA itself defines as the highest level of competition in women's college basketball.   This includes all colleges and universities that are members of the Power Conference Defendants, as well as those schools they collude with through NCAA agreements to fix the maximum price paid for the labor services of Division I women's basketball athletics.   To compete in the Division I Women's Basketball Labor Market, a college basketball program must be a member of the NCAA's Division I, and must play nearly all of its games against other teams that compete in that market.   It also must agree to abide by Division I's general rules mandating price fixing in the relevant market.

95.     From the standpoint of a prospective college basketball player, there is no reasonably interchangeable substitute for the Division I Women's Basketball Labor Market.  Participating in major college basketball provides prospective college women athletes the opportunity to compete at the highest level of college basketball while earning a college degree, and also offers prospective college basketball players a far greater prospect for advancement to a professional basketball career – either in the WNBA or overseas – than is available anywhere else.   Because of the unique

---

[4] NAIA stands for National Association of Intercollegiate Athletics.   The NAIA is the governing body of certain small collegiate athletic programs.

combination of athletic and academic benefits associated with competing in the Major Women's College Basketball offerings of the schools and conferences competing in the Division I Women's Basketball Labor Market, prospective college basketball players who have the opportunity to participate in Division I Women's Basketball Labor Market programs very rarely choose to pursue any alternatives to the Division I Women's Basketball Labor Market.

96.     Consistent with the status of the Division I Women's Basketball Labor Market as a distinct product market, each of the Conference Defendants markets its brand of basketball as a distinct product.  Thus, for example, Defendant SEC creates a product called Southeastern Conference Basketball that includes a full season of SEC basketball competition (including a pre-season against other conferences) that culminates in the annual SEC Women's Basketball Tournament.  SEC members then also compete against other conferences' members in post-season tournament games, such as in the NCAA "March Madness" tournament, the National Invitational Tournament ("NIT"), and others.  The Pac 12 similarly produces a popular, annual Pac-12 Women's Basketball Tournament which culminates in a televised Pac 12 Championship game broadcast on ESPN.  Each of the Conference Defendants also produces a conference season of Major College Basketball.

Defendant NCAA's expert in other litigation also has testified to this effect:

> It would be more accurate to say the NCAA is sponsoring sports leagues. It's not the league itself.... The NCAA is a collaboration of universities and conferences, and it sponsors and coordinates sports leagues, so the league itself would be, you know, say one of the collegiate leagues, like the Big Ten.

97.     While these 11 conferences serve as closer substitutes for each other (with the Power Conferences having substantially more overlap among each other and also higher market share among broadcasters and consumers), members of the live and television audiences for Women's Major College Basketball do not view other

- 26 -

basketball games, other sporting events, other entertainment options or any other product or category of products as an acceptable substitute for the Women's Major College Basketball produced by participants in the Division I Women's Basketball Labor Market.

### B.     Grants-in-Aid are Commercial Transactions

98.     Despite the nonprofit status of NCAA member schools, the transactions those schools make with premier Division I women's basketball athletes – full "grants-in-aid" in exchange for athletic services – cannot be termed "noncommercial," since schools make millions of dollars annually as a result of these transactions. In recent oral argument in the Northern District of California, the NCAA cited case precedent it acknowledged defines its activities as commercial.[5] Thus, the transactions between NCAA schools and student-athletes are commercial in nature, and therefore take place in a relevant market with respect to the Sherman Act.

99.     To field teams that can compete effectively on the field of play and generate increased revenues for their athletic programs, the colleges and universities that acquire talent in the Division I Women's Basketball Labor Market compete in marketing their services to the talented college athletes whose participation is necessary for the products to exist. As in all economic transactions, each party provides goods and services of benefit to the other party, on a number of dimensions. The dimensions in which this competition to recruit and retain student-athletes takes place includes the quality of the educational experiences provided to student-athletes, the quality of coaching services, the quality of training amenities, the quality of athletic and non-athletic opportunities following graduation, and the quality of the athletic competition on the field of play.

100.    Of particular relevance to this case, the participants in the Division I Women's Basketball Labor Market also compete in offering college athletes admission

---

[5] *See* O'Bannon SJM Hearing Tr. at page 84.

to their institutions and financial incentives to accept their offers of admission that take the form of grants-in-aid. A grant-in-aid can be provided purely in-kind (through tuition grants, room and board, and books), or in many cases in a mix of in-kind compensation and direct cash payments. These cash payments occur most commonly when students choose to live off campus and so in place of room and board, schools simply give each player a monthly check.

101.   In exchange, women's basketball athletes agree to compete on the school's basketball team, and the athletes' access to both in-kind and cash compensation is conditional on participation – an athlete who voluntarily leaves the team is not kicked out of school, but she is denied continued payment of a grant-in-aid for the remaining years of her college attendance.

### C.     The Division I Women's Basketball Labor Market Constitutes a Separate Market from NCAA Division II, NCAA Division III, NAIA, and Community / Junior Colleges

102.   NCAA Division II women's basketball programs are not in the same market as women's Division I basketball programs.

103.   The total number of NCAA Division II athletic scholarships is limited to 36. A typical NCAA college basketball team totals approximately 12-15 players. So, almost no Division II women's basketball players are awarded a full scholarship. Division II women's basketball programs have smaller budgets, play close to home, and do not generate excess revenue for the school as a whole. They provide lower quality facilities and coaching, and limited (if any) opportunities to showcase an athlete's talent on national television. There are few, if any, recorded instances of an athlete being offered the maximum allowed grant-in-aid to play at a Division I school choosing instead to accept a Division II scholarship.

104.   NCAA Division III basketball programs are prohibited from awarding athletic scholarships so they are not in the relevant market.

COMPLAINT

105.   The NAIA is the largest of only a few other associations sponsoring four-year college basketball.  It is made up of smaller schools, and NAIA rules permit only 11 scholarships.  So, almost no player receives a full scholarship to play basketball. NAIA women's basketball programs are also not in the relevant market. Nor are other college basketball sanctioning associations such as the National Christian Collegiate Athletic Association ("NCCAA") or the United States Collegiate Athletic Association ("USCAA").

106.   Two-year junior colleges cannot award college degrees. Superior high school basketball players do not choose to play at a junior college unless they are unable to meet NCAA academic eligibility standards.

107.   The differences between the NCAA divisions, and between the NCCAA and the NAIA (and other minor associations), are demonstrated by a variety of additional factors. Total basketball revenue is probably the most critical factor in differentiating the market. Total women's basketball revenue for NCAA Division I schools in 2009 was $137,437,000.  Total women's basketball revenue for the NCAA Division II schools in 2009 was $53,353,000.

108.   In contrast, total NCAA revenue distributed to the 351 Division I schools was 53% of all NCAA funds, compared to just 4% for the 311 Division II schools. Basketball revenue for all NAIA schools was $34,729,000 in 2009.

109.   The large differences in revenue between Division I schools and NAIA and Division II schools are driven in part by the differences in total attendance. In 2013, NCAA Division I schools had a total attendance of 8,012,073 fans; and all Division II basketball teams drew a more constrained attendance number of 3,076,782 fans,  Total attendance figures for the 257 NAIA basketball teams are not available, but the number is insignificant when compared to NCAA Division I attendance figures. As one such example, attendance at the NAIA championship game in 2012 was not even reported.  In contrast, the most recent NCAA Division I Women's Basketball Final Four championship game drew over 17,510 attendees.

110.   Average attendance figures also differentiate the relevant market. In 2012, Division I schools averaged 1,533 per game.  Division II basketball average 517 per game.  NAIA schools play in much smaller arenas and gyms.  Even the Women's NAIA championship game, played at the Frankfort Convention Center in Frankfort Kentucky from 2012 to 2014, has a maximum capacity of 5,000.   In contrast, the Walter J. Haas Pavilion, home to the Division I women's basketball team, the UCB Golden Bears, has a maximum capacity of 11,500.   Several Division I basketball schools compete in arenas with capacity in excess of 20,000.

111.   The differences between college basketball divisions in the quality of competition and the level of institutional support cause superior high school women's basketball players to choose Division I basketball schools scholarships over other Division I, Division II, or NAIA scholarships. For these players, Division I, Division II and NAIA women's basketball is not a substitute for Division I basketball schools.

112.   The intense recruitment of talented high school basketball players has led to the growth of companies which scout and rate thousands of players.  One of the prominent ranking systems, HoopGurlz from ESPN-W, rates high school players on a 0- to 5-star scale.[6]   Of the top 100 athletes tracked by HoopGurlz for 2014 who received a Division I scholarship offer, 100 % accepted.  The same is likely true for the next 500, and the next 500 after that.  Again, this indicates that Division II and/or NAIA basketball is not an adequate substitute.  The very fact that most NAIA and Division II women basketball players do not even rate a zero-star rating from HoopGurlz is evidence that they are of a far different caliber of quality than women athletes at Division I basketball schools.

---

[6]   Plaintiff Hartman received a 5-star HoopGurlz rating in 2011, and was ranked as a No. 7 women's basketball recruit in that year.  HoopGurlz did not use a star rating system in 2010, but ranked Plaintiff Jemerigbe a No. 15 women's basketball recruit in that year.

### D. There is Robust Competition Among NCAA Members in the Division I Women's Basketball Labor Market to Recruit and Retain Women's College Basketball Players

113.  There is acutely intense competition among Division I schools to recruit and retain the athletic services of women's college basketball players. These colleges and universities in the relevant market compete against one another to recruit and retain college athletes to participate in their athletic programs through agreements under which the athletes commit to attend a particular college or university in exchange for a grant-in-aid. NCAA Division I schools do not engage in price competition to recruit and retain those athletes due to the fact that the NCAA Bylaws at issue restrain them from doing so.

114.  NCAA members compete on different dimensions for class members to provide their labor services than would occur but for the illegal restraints. NCAA members compete by marketing in-kind benefits. For instance, colleges may compete to hire the coach that will be perceived as best able to potentially launch players to the NCAA Division I Women's Basketball Final Four Championship, or even into the WNBA. Instead of investing directly in prospective and current college athletes, colleges divert the acquired surplus by spending it on a veritable arms race to provide top-of-the-line training facilities which, in turn, are explicitly designed to attract and retail collegiate basketball players. Many colleges also market to women's college basketball players the strength of a college's academic programs in attracting the collegiate athletes' services.

115.  The NCAA prohibits its member institutions from directly paying college athletes salaries or even offering deferred trust funds or other forms of payment for their labor services. Instead, schools have restrained the direct benefits to only allow students with the desired athletic ability to receive the maximum allowed (per the restrain in suit) Division I basketball grants-in-aid which is demonstrably below the Cost of Attendance. In effect, the college athlete offers her athletic ability on behalf of

- 31 -

the NCAA member institution in exchange for what the NCAA has restrained to allow the market to pay – a reduction in the cost of attending college.

116.   The NCAA member institutions compensate women basketball players with these goods and educational services because the player bring substantial direct and indirect benefits to the school in the form of: (a) enhanced publicity and recruiting, which increases overall tuition revenue; (b) increase alumni donations; and (c) millions of dollars in gate receipts and licensing revenue.  If a school were to offer more or less to a player than the maximum allowed per the restraint, rival schools free of the restraint would respond by choosing from a collection of benefits (direct payments, indirect payments, educational superiority, etc.) to offer to make a more attractive offer for that athlete's services instead.

117.   Under the current system, although there is no required minimum scholarship level, the existing competition pushes virtually all Division I women's basketball scholarships up to the maximum allowed under the current collusive restraints.   Thus, competition exists but it is constrained by collusion:  if a school offers less than the maximum allowed by the restraint, rival schools compete by making the maximum offer allowed under the restraint.   But for the restraint, competition would be even more vigorous:  if a school were to offer less to a women college basketball athlete than the market rate (e.g., only the current collusive maximum), rival school free of the restraint would respond by choosing from a collection of benefits (direct payments, indirect payments, educational superiority, etc.) to make an even more attractive offer for that athlete's services.

**E.   NCAA Members' Competition for Class Members' Labor Services Is Constrained by the Unlawful Athletics Grant-in-Aid Cap**

118.      Because all of the NCAA member schools competing in the Division I Women's Basketball Labor Market have agreed to abide by the NCAA's athletics grant-in-aid cap, the schools do not compete against one another with respect to the amount of athletics financial aid and other forms of direct compensation they provide

- 32 -

to women's college basketball athletes. The NCAA and the colleges and universities in the relevant markets are able to enforce that agreement because, from the standpoint of prospective college athletes, there are no acceptable substitutes for the Division I Women's Basketball offered by the Conference Defendants. Absent the agreement not to compete on this dimension, the Conference Defendants' member schools and those of their co-conspirator conferences would compete vigorously to attract talent using increased financial aid and other direct forms of compensation. But, having secured an agreement of 100% of the schools and conferences in the Division I Women's Basketball Labor Market, the NCAA and the conferences in the relevant market thus collectively wield market and monopoly power in the relevant market and are able to dictate the terms upon which the college athletes who participate in Division I Women's Basketball receive grants-in-aid.

119. The demand for college athletes is such that, absent the unlawful grant-in-aid cap, the colleges and universities in the Division I Women's Basketball Labor Market would have competed against one another by offering higher amounts of athletic-based financial aid to college athletes, up to and likely past the true Cost of Attendance. Grants-in-aid are therefore artificially "capped" by the common scheme imposed by the NCAA at amounts lower than the amounts that would prevail in a truly competitive market. All or nearly all college athletes in the proposed Class receive the maximum athletics grant-in-aid amount that the colleges and universities are permitted to give under the NCAA's rules and regulations. As detailed herein, the Commissioners of the Conference Defendants have all publicly stated that, absent the NCAA restraint which they and their co-conspirators have collectively imposed upon the market, each Conference Defendant would allow and provide compensation in excess of the current cap.

120. As on such example, Defendant Big Ten Commissioner Jim Delaney has argued in favor or providing Big Ten athletes with "a yearly stipend that would provide a set amount of extra money to cover the difference between the actual cost of

attending a school versus what a full ride grant-in-aid provides. He identified a fixed cost of anywhere from $2,000 to $5,000 per athlete.[7]  Similarly, SEC Commissioner Mike Slive recently explained that, but for the NCAA-wide collusion, each of the five Power Conferences would immediately begin providing scholarships that cover the full cost of attendance: "If autonomy is granted to the five conferences, then *full cost of attendance will be one of the priorities for us to discuss once we have the autonomy that we seek*. At that point in time, there has to be a process amongst the 65 institutions that comprise the five conferences for developing legislation that we are … [to] implement the full cost of attendance."[8]

121.  Additional statements from the Conference Defendants, as identified herein, further underscore these Defendants' desire to use payments above the current grant-in-aid cap as part of the competition for college athlete recruits. Defendants' own public statements make clear that for the members of the Class, increased competition on the terms of the athletics-based financial aid and removal of the grant-in-aid cap would result in additional compensation, primarily in the form of increased athletics-based financial aid, for all members of the proposed Class.

## FACTUAL ALLEGATIONS

### A.  An Overview of the NCAA

#### 1.  The NCAA's basic structure

122.  The NCAA's publicly available documents confirm that it operates by way of horizontal agreements among its members. The NCAA, in its "Consolidated Financial Statements as of and for the Years Ended August 31, 2012 and 2011" (the "Financial Statements"), describes itself as an "unincorporated not-for-profit

---

[7]  Jon Johnston, '*Jim Delany and the NCAA:  The Times They Are A Changin'*,' SB Nation (July 25, 2013), available at http://www.cornnation.com/2013/7/25/4556982/jim-delany-and-the-ncaa-the-times-they-are-a-chagin.

[8]  James Crepa, '*Slive: Leagues, Union Advocates Have Common Ground*,' USA Today (Apr. 21, 2014), available at http://www.usatoday.com/story/ncaaf/2014/04/21/slive-leagues-union-advocates-have-common-ground/7974363/.

educational organization," "through which the colleges and universities of the nation speak and act on athletic matters at the national level." The NCAA additionally states that it "is a voluntary association of more than 1,200 institutions, conferences, and organizations devoted to the sound administration of intercollegiate athletics in all its phases." The NCAA further states that "[t]hrough the NCAA, its members consider any athletics issue that crosses regional or conference lines and is national in character," and it "serves as the colleges' national athletics governing agency."[9]

123.    The NCAA further states in its 2011 Internal Revenue Service Form 990 ("IRS Tax Return") that its "active member institutions and voting conferences are the ultimate voice in all Association decisions."

124.    The NCAA states on its website that it "oversees 89 championships in 23 sports. There are more than 400,000 student-athletes competing in three divisions at over 1,000 colleges and universities within the NCAA." The NCAA further states:

> Each member school is able to choose a level of competition that best fits its mission. Competition is offered in Division I (the largest programs that provide the most athletically related financial aid for student-athletes), Division II (limited financial aid) and Division III (no athletically related financial aid).
>
> There are 1,066 active member schools in the NCAA membership – 340 in Division I, 290 in Division II and 436 in Division III. The NCAA also contains 95 member conferences in all three divisions. Overall membership – counting schools, conferences and related associations – is 1,273.

125.    The NCAA, in Article 3.01 of its Constitution, states that "Division I offers three classes of membership: active, conference and affiliated."

---

[9]  Until the 1980s, the NCAA did not offer women's athletics. Instead an organization named the Association for Intercollegiate Athletics for Women (AIAW) governed women's collegiate sports in the United States. By 1982, however, all divisions of the NCAA offered national championship events for women's athletics and most members of the AIAW joined the NCAA. A year later in 1983, the 75th Convention approved an expansion to plan women's athletic program services and pushed for a women's championship program. The NCAA currently awards 89 national championships yearly.  Forty-four of these national championships are in women's collegiate sports.

126. NCAA Constitution Article 3.02.3, titled "Membership Categories," states:

> **3.02.3.1 Active Member.** An active member is a four-year college or university that is accredited by the appropriate regional accrediting agency and duly elected to active membership under the provisions of this article (see Constitution 3.2.3). Active members have the right to compete in NCAA championships, to vote on legislation and other issues before the Association, and to enjoy other privileges of membership designated in the constitution and bylaws of the Association.
>
> **3.02.3.2 Member Conference.** A member conference is a group of colleges and/or universities that conducts competition among its members and determines a conference champion in one or more sports (in which the NCAA conducts championships or for which it is responsible for providing playing rules for intercollegiate competition), duly elected to conference membership under the provisions of this article (see Constitution 3.3.3). A member conference is entitled to all of the privileges of active members except the right to compete in NCAA championships (see Constitution 3.3.2). Only those conferences that meet specific criteria as competitive and legislative bodies (see Constitution 3.02.1 and 3.02.2) and minimum standards related to size and division status are permitted to vote on legislation or other issues before the Association.

127. The NCAA states on its website that "each division creates its own rules governing personal, amateurism, recruiting, eligibility, benefits, financial aid, and playing and practice seasons – consistent with the overall governing principles of the Association. Every program must affiliate its core program with one of the three divisions."

## 2. The NCAA's Purpose

128. The NCAA explains in its Financial Statement that "[a] basic purpose of the NCAA is to maintain intercollegiate athletics as an integral part of the educational program and the athlete as an integral part of the student body."

129.   In its 2011 IRS Tax Return, the NCAA states that "[t]he mission of the NCAA national offices is to conduct efficiently the business of the association as directed by the membership ...." The NCAA therein further states that, "[t]he NCAA's purpose is to govern competition in a fair, safe, equitable and sportsmanlike manner and to integrate intercollegiate athletics into higher education so that the educational experience of the student-athlete is paramount."

130.   Article 1 of the NCAA's Constitution states that the NCAA's purposes include "(c) To encourage its members to adopt eligibility rules to comply with satisfactory standards of scholarship, sportsmanship and amateurism;" "(f) To supervise the conduct of, and to establish eligibility standards for, regional and national athletics events under the auspices of this Association;" "(h) To legislate, through bylaws or by resolutions of a Convention, upon any subject of general concern to the members related to the administration of intercollegiate athletics;" and (i) To study in general all phases of competitive intercollegiate athletics and establish standards whereby the colleges and universities of the United States can maintain their athletics programs on a high level."

### 3.    The NCAA's detailed governance structure

131.   The NCAA explains in its Financial Statement that it "operates through a governance structure, which empowers each division to guide and enhance their ongoing division-specific activities." It continues that, "[i]n Division I, the legislative system is based on conference representation and an eighteen member Board of Directors that approves legislation." The eighteen members are comprised of member institution chief executive officers.  The NCAA governance structure also includes an Executive Committee composed of sixteen member institution chief executive officers that oversees association-wide issues and which is charged with "ensuring that each division operates consistently with the basic purposes, fundamental policies, and general principles of the NCAA."  The Executive Committee is the "senior governing body of the NCAA."

COMPLAINT

### 4. The NCAA Manual

132. The NCAA and its members govern themselves through the NCAA's "Manuals," promulgated yearly, with additional quarterly updates. The Manuals include, among other things, the NCAA's "Constitution" and "Operating Bylaws." Through the NCAA Constitution and Bylaws, the NCAA and its members have adopted regulations governing all aspects of both men's and women's college sports. The NCAA Constitution and Bylaws were adopted by votes of the member institutions and may be amended by votes of the member institutions. Thus, the rules set forth in the NCAA Constitution and Bylaws constitute express, horizontal agreements among the NCAA and its members.

133. NCAA Constitution Article 5.2.2 ("Bylaws") states that "[e]ach division may adopt legislation to be included in the operating bylaws of the Association, which provide rules and regulations not inconsistent with the provisions of the constitution and which shall include, but not be limited to, the following particulars: (a) The administration of intercollegiate athletics by members of the Association; (b) The establishment and control of NCAA championships (games, matches, meets and tournaments) and other athletics events sponsored or sanctioned by the Association; (c) The procedures for administering and enforcing the provisions of the constitution and bylaws; and (d) The adoption of rules of play and competition in the various sports, and the delegation of authority in connection with such subjects to individuals, officers or committees."

### 5. The NCAA's Enforcement Structure

134. The agreement among the NCAA and the other Defendants, the punishment mechanisms, and the policing mechanisms are each laid out in clear, publicly-available language.

- 38 -

COMPLAINT

135.   The NCAA's Constitution and Bylaws contain extensive provisions, constituting express horizontal agreements among competitors, requiring NCAA members to abide by all provisions of the Constitution and Bylaws, including the athletics grant-in-aid limitation at issue in this Complaint. The Constitution and Bylaws further contain extensive provisions provided for discipline of members that do not abide by the rules. The Constitution and Bylaws further provide detailed monitoring provisions.

136.   For example, NCAA Constitution Article 1.3.2, titled "Obligations of Member Institutions," states that "[l]egislation governing the conduct of intercollegiate athletics programs of member institutions shall apply to basic athletics issues such as admissions, financial aid, eligibility and recruiting. Member institutions shall be obligated to apply and enforce this legislation ..." Article 2.8.1, titled "Responsibility of Institution," found within Article 2.8, titled "The Principle of Rules Compliance," reiterates that "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs," and that "[m]embers of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." Article 3.1, titled "Eligibility for Membership," reinforces that "institutions or organizations must accept and observe the principles set forth in the constitution and bylaws of the Association." Constitution Article 3.2.1.2, titled "Compliance with Association Rules," states that "[t]he institution shall administer its athletics programs in accordance with the constitution, bylaws and other legislation of the Association."

137.   Article 3.2.4, titled "Conditions and Obligations of Membership," states that "[t]he active members of this Association agree to administer their athletics programs in accordance with the constitution, bylaws and other legislation of the Association." Pursuant to Bylaw 18.4.2.1, each year, by September 15th, each NCAA

member must "[c]ertify, though its president or chancellor on a form approved by the Legislative Council, the institution's compliance with NCAA legislation."

138.   The NCAA's Constitution and Bylaws contain numerous disciplinary provisions detailing the dire consequences for any member that breaks the rules. The penalties can include expulsion from the NCAA. NCAA Constitution Article 1.3.2 states that "the enforcement procedures of the Association shall be applied to an institution when it fails to fulfill this obligation" to apply and enforce NCAA legislation. Article 2.8.3, titled "Penalty for Noncompliance," states that "[a]n institution found to have violated the Association's rules shall be subject to such disciplinary and corrective actions as may be determined by the Association." Article 3.2.5.1, titled "Termination of Suspension," states that "[t]he membership of any active member ... failing to meet the conditions and obligations of membership may be suspended, terminated or otherwise disciplined ...." Article 3.01.4 states that "[a]ll rights and privileges of a member shall cease immediately upon termination or suspension of its membership." Article 3.2.5.1.1, titled "Cessation of Rights and Privileges," states that "[a]ll rights and privileges of the member shall cease upon any termination or suspension of active membership."

139.   In addition to regulating its members, the NCAA directly regulates college athletes themselves. For example, Bylaw 14.1.3, for example, states that each year, a college athlete "shall sign a statement in a form prescribed by the Legislative Council ... related to ... eligibility ... financial aid, amateur status ... [f]ailure to complete and sign the statement shall result in the student-athlete's ineligibility for participation in all intercollegiate competition." Bylaw 14.01.3 states that, to be eligible, "a student-athlete shall be in compliance with all applicable provisions of the constitution and bylaws of the Association ...." Bylaw 14.1.1 states that, "[t]o be eligible for regular-season competition, NCAA championships, and for postseason football games, the student-athlete shall meet all general eligibility requirements." Constitution Article 3.2.4.3 states that, "[t]he institution shall be obligated immediately

to apply all applicable rules and withhold ineligible student-athletes from all intercollegiate competition." In other words, the NCAA mandates a collective boycott by all members of any athlete found to have deviated from the price-fixing activity alleged in this Complaint.

140. To reinforce its rules, the NCAA goes even further. For example, Constitution Article 3.2.4.11, titled "Discipline of Members," states that, "active members shall refrain from athletics competition with designated institutions as required under the provisions of the Association's enforcement procedures." In other words, the NCAA mandates a collective boycott by all members of any school found to have deviated from the price-fixing activity alleged in this Complaint.

141. NCAA member conferences further enforce NCAA rules. For example, Defendant the Pac 12 Conference, in its "2013-14 Handbook," states in its "Statement of Purpose" that "[t]he Conference is formed for the following purposes: a. To provide its members with a jointly governed body for sponsoring, supervising and regulating intercollegiate athletics as a conference member of the National Collegiate Athletics Association ("NCAA") in accordance with the principles, policies, constitution and bylaws of the NCAA ..." The Pac 12 continues that "[t]he members of the Conference value: ... Compliance with Conference and NCAA rules." The Pac 12 continues that "[t]he Conference may place a member on probation or suspension, or terminate its membership, by vote of at least three-fourths of all the members of the CEO Group eligible to vote on the matter, for one or more of the following reasons: ... Violating rules and regulations of the NCAA, or becoming ineligible for active membership in Division I of the NCAA, by a written determination of the NCAA; ... Such disciplinary action may also include the assessment of financial penalties." The Pac 12 continues that "[t]he Conference is a member of the NCAA, therefore, all member institutions are bound by NCAA rules and regulations unless the Conference rules are more demanding." The Pac 12 continues that "[t]he rules of the National Collegiate Athletic Association shall govern all matters concerning financial aid to student-athletes except

to the extent that such rules are modified by the CEO Group." The Pac 12 continues that "The rules of the National Collegiate Athletic Association shall govern all matters of student-athlete eligibility except to the extent that such rules are modified for practice and competition in Conference sports by regulations adopted by the CEO Group."

142.   As a practical matter, any academic institution that sponsors a Division I women's basketball program must maintain membership in the NCAA and abide by the rules and regulations promulgated by the NCAA and its members, including the NCAA Constitution, Bylaws, Executive Regulations and Official Interpretations. All colleges and universities that participate in the relevant market are NCAA members, have conferred upon the NCAA the right to sanction and approve games including college women's postseason tournament basketball games, have agreed to restrictions under which they are forbidden from competing on the field against non-NCAA teams, and have agreed to abide by all of the NCAA's rules and regulations. There is no practical alternative to NCAA membership for any academic institution that wishes to sponsor a Major College Basketball program for women.  There is no Major College Basketball program in the United States that is not an NCAA member, abiding by the NCAA rules.

143.   As a result of the NCAA rules embodied in the grant-in-aid cap, no NCAA member school has provided any college athlete with athletics-based financial aid in excess of the grant-in-aid cap, other than a few noted "scandals" in which the NCAA imposed punishments on schools for exceeding the cap through the provision of "under-the-table" benefits.

144.   In other respects, the academic institutions in the relevant market aggressively compete against one another on the field of play, in recruiting college athletes, in seeking to recruit and retain talented coaching staffs, in building athletic facilities that will attract athletes and coaches and in soliciting revenues from television, radio and corporate sponsors. Absent the unlawful grant-in-aid cap, the

same competitive forces would result in more valuable grants-in-aid and other forms of direct compensation.

### B.  The NCAA Bylaw Challenged in this Litigation

145.  The Plaintiffs in this litigation specifically challenge NCAA Bylaw 15.1, titled "Maximum Limit on Financial Aid – Individual," which states in pertinent part the following: "A student-athlete may receive institutional financial aid based on athletics ability (per Bylaw 15.02.4.1) and educational expenses awarded per Bylaw 15.2.6.4 up to the value of a full grant-in-aid ...." Bylaw 15.02.5, entitled "Full Grant-in-Aid," states that "A full grant-in-aid is financial aid that consists of tuition and fees, room and board, and required course-related books."

146.  Other NCAA Bylaws reinforce the prohibition. Bylaw 12.01.1 states that "[o]nly an amateur student-athlete is eligible for intercollegiate athletics participation in a particular sport." Bylaw 12.1.2 states that "[a]n individual loses amateur status and thus shall not be eligible for intercollegiate competition in a particular sport if the individual: Uses his or her athletics skill (directly or indirectly) for pay in any form in that sport ...." Bylaw 12.02.7 states that "[p]ay is the receipt of funds, awards or benefits not permitted by the governing legislation of the Association for participation in athletics." Bylaw 12.01.4, titled "Permissible Grant-in-Aid," states that "[a] grant-in-aid administered by an educational institution is not considered to be pay or the promise of pay for athletics skill, provided it does not exceed the financial aid limitations set by the Association's membership." Bylaw 12.1.2.1, tilted "Prohibited Forms of Pay," states that "'[p]ay,' as used in Bylaw 12.1.2 above, includes, but is not limited to the following: ... Educational expenses not permitted by the governing legislation of this Association (see Bylaw 15 regarding permissible financial aid to enrolled student-athletes)." Bylaw 15.01.2 states that "[a]ny student-athlete who receives financial aid other than that permitted by the Association shall not be eligible for intercollegiate athletics."

147.   Under the grant-in-aid cap, which is set forth in Division I Bylaw 15.02.5, a "Full Grant-In Aid" to a college athlete is defined as "financial aid that consists of tuition and fees, room and board, and required course-related books." The grant-in-aid for each member institution is thus expressly restricted to cover an amount less than the full Cost of Attendance at any member institution, because the Cost of Attendance is separately and more broadly defined by NCAA Division I Bylaw 15.02.2 to be "an amount calculated by an institutional financial aid office, using federal regulations, that includes the total cost of tuition and fees, room and board, books and supplies, transportation, and other expenses related to attendance at the institution." It is also expressly restricted below the level that would prevail in a market free of anti-competitive collusion, as is made clear by the statements of the Conference Defendants, their member schools, and their co-conspirators and co-conspirator's member schools. As described below, absent collusion regarding GIA's, the Conference Defendants would raise the amount they offer to athletes in the Division I Women's Basketball Market above the current maximum allowed GIA.

148.   NCAA Bylaw 15.02.2.1, titled "Calculation of Cost of Attendance," further states: "An institution must calculate the Cost of Attendance for student-athletes in accordance with the cost-of-attendance policies and procedures that are used for students in general. Accordingly, if an institution's policy allows for students' direct and indirect costs (*e.g.*, tuition, fees, room and board, books, supplies, transportation, child care, cost related to a disability and miscellaneous personal expenses) to be adjusted on an individual basis from the institution's standard cost figure, it is permissible to make the same adjustment for student-athletes, provided the adjustment is documented and is available on an equitable basis to all students with similar circumstances who request an adjustment." Therefore, for every member of the proposed class, each university has already calculated his Cost of Attendance figure, per NCAA requirements.

149.   The NCAA enforces the agreed-upon grant-in-aid cap through a further agreement under which any college athlete who receives athletics-based financial aid in excess of the grant-in-aid cap is ineligible to compete in NCAA sports. NCAA members have set up elaborate and sophisticated mechanisms to monitor compliance and penalize violations of the horizontal restraints on trade. Among other things, the NCAA requires members to report each college athlete's financial aid information to the NCAA on or before the first day of outside competition for the sport in which the college athlete participates. This information is compiled onto a form known as a "Squad List" and each Conference Defendant's member school maintains control of this document. The NCAA makes available to its members, at no charge, compliance software that applies NCAA regulations to college athletes' information, generates reports to the NCAA and warns the member when the jointly imposed limit on a college athlete's financial aid has been exceeded. Violations are adjudicated and penalties imposed by competing member institutions.

150.   Any Division I member that deviates from the NCAA rules limiting the amount, terms and conditions of financial aid to college athletes is subject to severe sanctions, including expulsion, under NCAA rules. These punishments have included a complete ban on football participation (the "death penalty") as well as a reduction in the number of grants-in-aid a school can offer. The very fact that a reduction in the number of grants-in-aid is seen as a severe punishment is a clear sign as to how valuable even the least scholarship athlete on a team is.

151.   Moreover, because NCAA rules prohibit members from playing games with non-NCAA members, an expelled member would be unable to continue participating in major college sports. Because sports businesses, like college basketball teams, require opponents to provide a game for its consumers, and require multiple opponents to form a league season of basketball that culminates in a league championship, an organized, collective boycott by all other participants in Major College Basketball constitutes a tremendous barrier to any one team (or even a small

handful of teams) succeeding in forming a rival league if boycotted by all NCAA members. Thus, the NCAA's price-fixing regime is designed with strict enforcement built in that prevents a fracturing of the cartel.

152.   As a result, Division I schools do not deviate from the rules limiting the amount, terms and conditions of financial aid to college athletes other than the exceptional case of what the NCAA refers to as "cheating," such as providing summer housing for incoming college women's basketball recruits at reduced or no cost (University of Minnesota).

153.   For many years, the grant-in-aid cap has restricted the amount of athletics-based financial aid available to college athletes in NCAA Division I, and it continues to do so to this day. As the NCAA itself writes, "[a]n "incidental allowance" of $15 per month was once justified as an educational expense that was tied to Cost of Attendance, but was eliminated from the NCAA grant-in-aid definition in the 1970s." This statement refers to the anti-competitive decision in 1976 to take an already collusive limitation on compensation to athletes and further reduce it through a collusive decision to remove certain elements of the then-permitted GIA. While in 1975-76, the NCAA allowed its members to provide direct compensation up to the value of "... commonly accepted educational expenses (i.e., tuition and fees; room and board; required course-related supplies and books, and incidental expenses not in excess of fifteen dollars per month) ...," as of 1976-77, that limit was lowered to include only "... commonly accepted educational expenses (i.e., tuition and fees, room and board and required course-related books) ...."

154.   The "laundry" stipend was first allowed per NCAA rules in 1956, and was set at $15.  According to the U.S. Department of Labor's Bureau of Statistics' CPI Inflation Calculator, $15 in 1956 had the same buying power then as $130.74 does today.  Presuming that $130.74 per month was paid for nine months each year during an average academic year, this would equal $1,176.66 per year per player in 2014 dollars.

155. In addition to collectively prohibiting this "laundry money" payment, since 1976-77, through the artificial limits on financial aid embodied in the grant-in-aid cap, the NCAA and its members have agreed among themselves not to include in financial aid such costs as school supplies, recommended text books, travel costs, and incidental expenses. Additionally, a cap prohibiting the provision of health and disability insurance existence until eliminated, in 2008, by legal settlement.

156. Without the grant-in-aid cap, the colleges and universities that sponsor college women's basketball would provide athletic scholarships in an amount in line with the true cost of attending college and the college athlete's value in a competitive market. The same competitive forces that drive schools to provide coaches with million-dollar salaries and build lavish athletic facilities would also compel those schools to provide athletics-based grants-in-aid at a competitive level. Indeed, the athletic directors of the University of Texas acknowledged this in a 2013 Declaration in other litigation in this District, when they declared that "[i]ntroduction of that kind of commercial recruiting competition for and between student-athletes would heavily impact recruiting throughout NCAA institutions, including Division I. At least some student-athletes would likely gravitate toward schools that would 'pay' them the most amount of money...." The grant-in-aid cap thus enables the NCAA, its member colleges and universities, and the coaches to reap all of the financial benefits of big-time college sports, while depriving class members of needed dollars in athletics-based financial aid.

157. Through the grant-in-aid cap, the NCAA and its members have thus combined and conspired to fix, depress or stabilize the amount, terms and conditions of athletics-based financial assistance to class members in the relevant market.

158. The grant-in-aid cap has been successful and effective. As a result of the grant-in-aid cap, class members receive lower amounts of financial assistance and other direct compensation than they would receive if class members were permitted to receive athletics-based financial aid covering their true costs of attendance.

- 47 -

159.   Absent Defendants' unlawful horizontal restraint on competition through the grant-in-aid cap, competitive grant-in-aid offers would be an important means by which NCAA Division I members would compete for and recruit Class Members, and Class Members would receive more generous scholarships and other financial aid as a result of competition among those schools. The restraint's anti-competitive effects substantially outweigh any alleged pro-competitive effects that Defendants may offer.

### C.   Reasonable and less restrictive alternatives exist

160.   There are reasonable and less restrictive alternatives to Defendants' anticompetitive practices. For example, the Conference Defendants could be allowed to compete amongst each other as to the financial aid terms that conference members make available to college players. *See, e.g.*, Jonathan Mahler, "*College Athletes Should be Paid Exactly This Much*," Business Week, January 2, 2014 ("Once the NCAA monopoly has been broken, the various conferences would be free to write rules for their respective members. Some conferences might even experiment with salary caps and see how the market reacts. As long as they weren't colluding to fix prices – as they are doing now – the market would find an equilibrium."). Such incremental competition would allay the fears (even though unfounded) of those that decry the repercussions of an instantaneous transition to a wide-open free market, with every school making its own independent decisions.

161.   The Conference Defendants already compete with each other in other ways. Among the most obvious is their competition in the coaching labor market to attract the best coaches to help recruit athletes and to win games. In litigation captioned *Law v. NCAA*, the plaintiffs challenged efforts similar to the grant-in-aid cap in suit that were undertaken to fix the price of (basketball) coaching talent. In that case, after applying a quick look, the Court, and the Court of Appeals, both found the NCAA's nationwide collusion of this labor market violated the antitrust laws. Despite the NCAA's claim that such rules were necessary to the survival of college sports, no such collapse has occurred.

- 48 -

162. In the absence of the anticompetitive, collusive restraint detailed herein, the Conference Defendants similarly could be expected to compete on terms of financial aid that their members offer to current and prospective women's college basketball players. Each could independently (without the need for collusion across the Conference Defendants) determine a method to compete regarding grants-in-aid, while still preserving consumer interest in its own brand of women's college basketball. However, given the anticompetitive history detailed herein, such competition should not occur without judicial oversight. Plaintiffs therefore request the appointment of an Antitrust Compliance Monitor to ensure that Defendants do not unlawfully impede competition among themselves even after the NCAA is enjoined from enforcing the current price-fixing agreement.

163. The need for such a Monitor is abundantly clear from the current conduct of the Power Conference Defendants. Even as the Power Conference Defendants acknowledge the anticompetitive effect of their current membership in the NCAA by explaining NCAA rules prevent them from offering the higher compensation they think the market demands, they simultaneously seek to form a cartel among themselves. In a system where each school currently has a "Compliance Officer" who enforces, not the antitrust laws, but the price-fixing rules of an illegal cartel, an appointed monitor will be needed to change a deep culturally-rooted belief in collusion among competitors.

164. Each Conference Defendant has indicated that if left to design its own compensation plan, each would increase the current levels by at least the difference between the current collusively-set grant-in-aid maximum and the true Cost of Attendance. Ending collusion would widen consumer choice as each Conference Defendant (as well as their co-conspirators) could choose the level of payment that best balances its desire to attract the best talent with the perceived reaction of its consumers (broadcasters, alumni, other students, fans).

165.   Defendants' conduct, therefore, artificially limits and narrows consumer choice and prevents new products from coming on the market and existing.

166.   Defendant NCAA's expert, in other litigation, has testified that lifting the current cap would be pro-competitive: "For example, I have asked myself, suppose that the NCAA were to define differently what is an appropriate payment that would cover student expenses and tuition and to change that amount. It's a subject that has been under some debate, and I think there are changes in the rules that could be made that would still achieve the pro-competitive purposes that the NCAA has set out, but I have not seen my charge by the NCAA as advising them as to how to change their regulations."

167.   The ABA's *Antitrust* publication in 2000 published an analysis of the NCAA's price-fixing rules and concluded that less restrictive alternatives, such as conference-based competition, exist.   Daniel A. Rascher and Andrew D. Schwarz, "Neither Reasonable nor Necessary: 'Amateurism' in Big-Time College Sports," *Antitrust*, Spring 2000, pp. 51-56.

168.   NCAA member conferences already compete: (a) on non-monetary terms to attract the best players to their conferences; (b) to attract member institutions (a phenomenon known, as of late, by the term "conference realignment"); (c) to retain member institutions; (d) to provide desirable revenue sharing among member institutions (whether equal sharing, or unequal sharing); (e) to provide conference "stability"; (f) to attract favorable television broadcast revenues; (g) to provide conference-owned television networks; (h) to attract sponsorship monies; and (i) to retain the most qualified referees and officials.

**D.    The NCAA's Public Statements Regarding the Pro-competitive Nature of the Proposed Stipend and Absence of Pro-competitive Justifications for Capping Compensation at Current Levels**

169.   The NCAA has made a litany of public comments seemingly supporting the concept of a stipend. Each one seems potentially promising, until one realizes they

go back to at least as early as 2003 (leaving aside that stipends were provided prior to 1976-77 when they were stopped by the NCAA), and that little change ever followed.

170. Just six months ago, on July 9, 2014, NCAA President Mark Emmert testified before the United States Senate's Commerce Committee that it is imperative that college athletes receive full cost of attendance scholarships.

171. Earlier that year, in April 2014, the NCAA distributed to its members a memorandum with the following introduction: "The NCAA communications staff prepared the following material to assist members in conducting public outreach or responding to media requests." Under the section "We Can Do Better," the memorandum stated that "[o]ur members believe in addressing some of the legitimate concerns that critics have raised, like providing the full cost of attendance—to help pay for that trip home or to grab a movie and dinner—particularly for those students with limited economic means."

172. On March 31, 2014, CBSSports.com reported that Wake Forest University president Nathan Hatch, chairperson of the NCAA's Steering Committee for Governance, distributed a document to NCAA members detailing the NCAA rules that the Power Conferences would seek to amend or change in upcoming NCAA governance discussions. The article continued that "Among the topics addressed in what is labeled an 'Attachment to Memorandum': . . . Provide full cost of attendance to players." The article continued: "'I think what was reflected in that memo is a growing consensus,' Pac-12 commissioner Larry Scott said." The actual memorandum is titled "Enhanced List of Policies Subject to Group of Five Autonomous Decision-Making," and states in pertinent part: "The Group of Five Conferences' 'Vision for College Athletics in the 21st Century,' previously identified the following items for Legislative Autonomy to be allocated to the Five Conferences: a. Define the full grant-in-aid as meeting a student-athlete's cost of attendance (Bylaws 15.1 and 15.2.4) . . . c. Enhance benefits provided to student-athletes for the purpose of supporting their needs based on available resources rather than com

173.   In January 2014, NCAA Division I Board of Directors Chairman Nathan Hatch, also the President of NCAA Division I member Wake Forest University, circulated a letter to NCAA members regarding a "template prepared by the Division I Board of Directors' Steering Committee on Governance that is intended to aid participants during the January 16 and 17 Division I Dialogue in San Diego." The "template" includes a "Proposed Legislative Structure" regarding "Legislative Autonomy" that is "[d]efined as the ability, within the current NCAA structure, for the SEC, B10 [sic, i.e. the Big Ten], PAC-12, Atlantic Coast Conference and Big 12 conferences and their institutions to adopt reforms in a regulatory structure that respects the demands on student-athletes in the 21st century and acknowledges the need for these conferences / institutions to define rules that address their unique challenges."  The document continues that one of the "Proposed Areas of Autonomy" is to "[d]efine a full grant-in-aid as meeting a student-athlete's cost of attendance in a manner consistent with the core values of the collegiate model and not to exceed total cost of attendance."

174.   On January 13, 2014, the *Associated Press* reported that "NCAA President Mark Emmert said Monday that providing a stipend to student-athletes seems less threatening to the schools that earlier knocked down a proposal to increase the value of a scholarship to cover the full cost of attendance. 'It seems to be a much less controversial notion today than it was 18 months ago,' Emmert said of the stipend proposal. 'As we've talked about it more and the membership has had a chance to digest it, it's being seen as less threatening.'"

175.   Similar statements supporting the stipend concept were reported in 2013. For example, on April 10, 2013, *The Chronicle of Higher Education* reported that "[w]hen [NCAA President] Mark Emmert gathered together more than 50 college presidents nearly two years ago to discuss ideas for reforming big-time sports, the group came to a pretty clear consensus on the need to increase aid to athletes."  The article continued:  "With big money flowing in from TV contracts, and increasing

amounts going toward coaches' salaries and facilities, the idea of allowing Division I colleges to direct up to $2,000 more a year to certain players seemed to make sense." The unfortunate postscript: "after a series of failed attempts to carry out the proposal, the NCAA is essentially back to the drawing board."

176.    The *Chronicle of Higher Education* article quoted Sidney A. McPhee, the President of NCAA member Middle Tennessee State, and a proponent of the stipend, as being the "head of the NCAA Student-Athlete Well-Being Working Group" and the "chief arbiter of the stipend debate." It further states that "[t]he climate has frustrated Mr. McPhee, who believes that even the less-wealthy programs have an obligation to make a priority of players and their unmet financial needs. 'If you want to compete [in Division I,]' he says, 'you've got to step up.'" (bracketed text in original). The article continues that "[i]t's also a matter of fairness, he says. Institutions increase aid packages for other students all the time, so why shouldn't they do it for athletes too?" The article continues that "[o]ver the past few months, Mr. McPhee has expanded his group to include more athletic directors, presidents, financial aid directors, and others. In recent weeks the group has spent much more time looking at the concept of aid and different ways to enhance it." The article explained that rather than base any cap on athlete compensation on an assessment of the least restrictive alternative available, it was a simple question of what best suited the self-interest of the members of the cartel: "[i]n a recent straw poll, the group agreed almost unanimously with the idea of allowing increased aid for athletes. Still, Mr. McPhee is not optimistic that Division I members will ultimately support such a change. 'There is still continuing opposition to doing anything,' he says. 'I'm afraid that whatever we do will have a high likelihood of an override.'"

177.    A September 16, 2013 article in *U.S. News & World Report* regarding stipend and other proposed reforms, stated that the NCAA Division I Board of Directors "hope to adopt proposals at its meeting next April [2014], and then have a special meeting for the membership next summer. 'That could involve bringing all 350

members of Division I together and having every school vote on it,' [NCAA President] Emmert said. 'It'll be a bit like a constitutional convention.'" Here, however, the referenced "convention" was in reality an open meeting of an anticompetitive cartel, in which participants explicitly met to discuss whether the current fixed-price offering should be adjusted to another fixed-price offering.

178.   On November 24, 2013, the *New York Times* reported that "Elizabeth Altmaier, a professor of Iowa who served on a number of N.C.A.A. panels on commercialism as a faculty athletics representative, said she believed there needed to be a way for college athletes to get more than scholarships.  'People who way, in a very superior manner, that these kids had a college education and that's sufficient remuneration are naïve at best, and blind at worst, to the realities of being a student athlete in a Division I institution.'"

179.   On December 11, 2013, the *New York Times* reported NCAA president Emmert as stating:  "'There is an interest in making sure that full cost of attendance is covered…. That number varies from school to school.  It can vary from $0 to $6,000. A debate that members will have is, are we going to allow the closing of that gap? And if so, how high can we go?  No one right now want to go above the full cost of attendance, that a student-athlete could get what it costs to be a student, but they're students, not unionized employees, not somebody that's on the payroll.'"   These comments, however, only serve to underscore the point that the NCCA, its co-Defendants and other co-conspirators believe that, rather than act competitively and face a market price, may impose whatever price-fixed amount of compensation they "allow" cartel members to offer with impunity.

180.   An *Associated Press* article dated December 5, 2012 also highlights the pro-competitive aspect of the proposed stipend.  The article reports that NCAA president Mark "Emmert chided athletic programs that make major decisions guided by efforts to generate more revenue, then complain they can't afford a stipend.  At the forum, which is sponsored by IMG and hosted by SportsBusinessDaily/Global/Journal,

Emmert said of conference realignment:  'When people say it's all about money, that's not accurate.'  He later took that argument to the stipends cause:  'When the world believes it's all a money grab, how can you say we can stick with the same scholarship model as 40 years ago.'

181.   Another article, dated December 6, 2012 and presently posted by the NCAA on its website, is entitled "NCAA President Emmert fights for student-athletes' right to more funds."  It states:  "NCAA President Mark Emmert is still determined to provide college athletes with 2,000 dollars for expenses not covered by scholarships."  The article continues:  "The stipends would help cover the full cost of attending college, which scholarships don't meet, providing money for expenses beyond tuition, room and board, books and fees."  Emmert goes on to state:  "The biggest key to implementing the stipends may be changing schools' mind-sets.  'This is a branding issue', Emmert said."  The article continues:  "Emmert chided programs that make major decisions guided by efforts to generate more revenue, then complain they can't afford a stipend."  Emmert further stated:  "[M]oney is not the issue.  Money is pouring in from TV deals.  The new college football playoff contract [alone] will be worth about 470 million dollars a year."

182.   Back on May 24, 2011, the NCAA posted on its website an article by an NCAA member school's assistant director of compliance, suggesting the pro-competitive benefits of paying stipends and additional monies to cover student athletes' cost of attendance:  "A few hundred bucks a month is not going to make a great deal of difference for student-athletes who are offered lavish gifts like cars, personal training, jewelry, trips to South Beach, etc.  But according to former NFL agent Josh Luchs, many times the benefits used to recruit a student-athlete are fairly modest.  If a student-athlete can no longer be swayed by pocket money, agents will be forced to provide bigger benefits to student-athletes.  And bigger benefits are easier to catch….  With the full cost of attendance covered for revenue sports and star athletes,

COMPLAINT

plus all the existing and legal ways to get cash to a student-athlete, it will no longer be a case of *needing* to take money from agents or boosters.

183.   NCAA president Mark Emmert also has repeatedly explained that there is little chance that such payments will generate concerns regarding competitive balance because the power of competition along many indirect fronts has already distributed talent in proportion to a school's/conference's ability to compete for talent directly through the relief requested here:

  a.   "When you look at a student who's being recruited by heavily funded institutions, those kids are rarely asking, 'Do I go here, or do I go to an institution that has less money?'  If students have the opportunity to go to that dominant athletic program, they're going to go.[10]

  b.   "I don't think any of the Butler kids were recruited by, you know, by Kansas."[11]

  c.   "So, if you've got a gap between $40,000 and $150,000, (then) $2,000 isn't going to make much of a difference."[12]

184.   On December 15, 2011, the NCAA posted on its website another article by an NCAA member school's assistant direct of compliance, who stated that "Proposal 2011-96, which allows schools to provide up to $2,000 beyond the current grant-in-aid limits, is not an unfunded mandate.  They key word is allows.  The proposal requires schools to do nothing, just permits them to."

185.   Myles Brand, the former president of the NCAA admitted, as far back as 2003, that Defendants' unlawful agreements are unnecessary to preserve amateurism,

---

[10]   Seth Wickersham, '*Emmert:  Don't' Lie, Don't Steal'*, ESPN College Sports (Dec. 2, 2011), available at http://espn.go.com/college-sports/story/_/id/7303903/ncaa-president-mark-emmert-makes-rulebook-changes-offers-stipends-athletes.

[11]   *Id.*

[12]   Joseph Duarte, '*NCAA's Emmert Says Legislation Won't Impact Gap Between Haves, Have-Nots,*' Houston Chron. (Nov. 3. 2011).

and that athletic scholarships covering the Cost of Attendance would be fully compatible with the legitimate purposes and objectives of the NCAA.  In a letter to the editors of the Denver Post, then-president Brand wrote in 2003:

> Ideally, the value of an athletically-related scholarship would be increased to cover the full-cost of attendance, calculated as between $2000 and $3000 more per year than is currently provided.[13]  I favor this approach of providing the full cost of attendance.  The Division I membership, which is where the final decision will be made, will continue to address the issue over the next several months.[14]

186.    Indeed, Brand reconfirmed his support for eliminating the grant-in-aid cap even after a predecessor lawsuit was filed.[15]  In a later article published in 2006, former NCAA president Brand stated that eliminating the grant-in-aid cap to allow scholarships covering the full Cost of Attendance "strikes me as the reasonable approach."[16]

**E.    The Recent History of the Latest Stipend Proposal**

187.    On October 27, 2011, the NCAA issued a press release recommending an additional 'cost of attendance' stipend of up to $2,000, stating:

> The Division I Board of Directors continued the quick-action precedent set earlier this summer, adopting a package of proposals Thursday that toughen academic standards and provide increased academic and economic support to student athletes.
>
> 'These changes demonstrate a remarkable resolve by presidents,' said NCAA President Mark Emmert.  'They represent a return to and a focus on values that are at the core of what intercollegiate athletics are all about.

---

[13]   The referenced stipend of $2000 and $3000 is, of course, in 2003 dollars, i.e., the amounts do not take into consideration cost of living or other cost of attendance-related increases.

[14]   Myles Brand, Letter to the Editor, '*Welfare of Student-Athletes NCAA's Top Priority*,' Denver Post (Aug. 17, 2003).

[15]   *See* Mark Alesia, '*Lawsuit:  NCAA Should Pay 'Full Cost'*,' Indianapolis Star (Feb. 22, 2006).

[16]   Mark Alesia, '*Tourney Money Fuels Pay to Play Debate: Fewer than 1% of Athletes Help Make More than 90% of the NCAA's Money*,' Indianapolis Star (Apr. 1, 2006).

They also represent a clear signal to the world about what we care about and what we stand for.'

The Board approved an implementation plan…that mandates a certain level of academic performance in order to participate in postseason competition. The eligibility requirement will begin phasing in with the 2012-13 academic year.

The Board also adopted legislation given student-athletes who receive full athletic scholarships the opportunity to receive additional athletics aid up to the full cost of attendance of $2,000, whichever is less.

The working group that made the recommendation told the board the $2,000 figure is meaningful in addressing the miscellaneous expenses student-athletes no have. Institutions will not be required to offer the benefit, but conferences are encouraged to consider common application within their membership.

***

Student-athlete well-being improvements

The Board also adopted legislation that addresses the miscellaneous cost of attending college. Student-athletes who receive full athletic scholarships or get other financial aid combined with athletics aid to equal a full scholarship will have the opportunity to receive additional athletics aid (or other institutional aid, include use of the Student-Athlete Opportunity Fund) up to the institution's calculation of full cost of attendance or $2,000, whichever is less.

The figure will be adjusted according to the consumer price index, so the presidents will not need to approve new figures when the cost of living changes. The Board resolved to no revisit the $2,000 amount for three years.

***

Penn State President Graham Spanier chaired the working group established to examine student-athlete well-being issues.

'We understand the situation of our student-athletes. This isn't about paying student-athletes, but it is about being fair and recognizing that in Division I it ought to be important to meet this need,' Spanier said. 'We all have lots of different choices to make, but we felt that these proposals are right for our student-athletes.'

- 58 -

188.   The NCAA further stated that the new rule would apply to "[a]id agreements that take effect August 1, 2012 [awards can be executed before that date]."

189.   The NCAA's admission that these 'cost of attendance' stipends do not constitute 'pay' ("This isn't about paying student-athletes.") is telling.   The NCAA knows that its definition of 'pay' is entirely based on the arbitrary decisions of the cartel.   If the NCCA allows compensation, by Rule (e.g., Bylaw 12.02.7) the compensation is instantly transformed from pay into allowable financial aid.   Bylaw 12.02.7 defines "[p]ay" as "the receipt of funds, awards or benefits *not permitted by the governing legislation of the Association* for participation in athletics."   (italics added).   In this way, the NCCA makes clear that the price student-athlete labor is fixed, the rules are arbitrary and there is nothing other than the will of a collusive body, and certainly no neutral weighing of the pro-competitive benefits versus the perils of collusion, that makes pricing decisions.

190.   On December 8, 2011, the NCAA posted on its website "Frequently Asked Questions and stated:  "Does the same amount have to be offered every year of a multi-year award?  Multi-year awards are not required to award the same amount each year.  For example, a multi-year agreement can stipulate that a student-athlete will receive a certain amount in the freshman year and a different amount in the sophomore year."

191.   The NCAA also stated in this FAQ section that the legislation approving the proposed 'cost of attendance' stipend is subject to a cartel vote:  "What if the legislation is overwritten?  Institutions were permitted to offer both the miscellaneous expense allowance and multi-year awards to recruits beginning with the early [National Letter of Intent] signing period in November.  Both rules are subject to override, but agreements signed prior to the last day for override requests (December 26) will be honored."

192.   In fact, the cartel combined to disallow even this small amount of market-based competition.   On December 15, 2011, the NCAA's news service reported:  "The new rule allowing Division I institutions to give some student-athletes an additional $2,000 miscellaneous expense allowance has been suspended until the Board of Directors convenes in January.  As of Dec. 15, enough schools – 125 – have called for an override of the legislation to prompt the automatic suspension under NCAA bylaws."   The release went on to quote NCAA president Mark Emmert as stating:  "Based on conversations I have had, I am confident that there remains a very high level of support for this permissive legislation to provide better support for our student athletes."

193.    The NCCA make clear, however, that the additional 'cost of attendance' stipend posed no harm to the NCAA, itself, or to the continued success of amateur college basketball, noting that "[a]ny allowances offered in writing during the November [2011] early signing period will be honored….  Nearly 10,000 prospective Division I student-athletes signed National Letters of Intent for next year during the early signing period in November."  The NCAA continued:  "Unless the Board takes some action to alter the proposal, prospective student-athletes who with schools during the upcoming signing periods in February and April will not have the option to receive the additional $2,000 allowance.

194.   On January 14, 2012, the NCAA issued another press release, stating:  "The Division I Board of Directors reaffirmed Saturday its support for a $2,000 miscellaneous expense allowance, but direct the Student-Athlete Well-Being working group to come back to the presidents [of NCAA member institutions] in April with recommendations for implementation.

195.   An *Associated Press* article on November 3, 2012 reported:  "The $2,000 was a 'compromise' among [NCAA Division I Board of Directors], [NCAA president Mark] Emmert said.  Some thought that the total should have been higher, but Emmert said the board wanted to settle on a reasonable amount it fells all schools would be able

to afford.  'It could've been higher, it could've been lower,' he said.  'But that was the number that everyone agreed was a good place to be.'"  These statements make clear that the stipend rule was not based on market forces or on an assessment of the least restrictive alternative available, but to appease cost-containment concerns of cartel members.  Indeed, as further reported in the *Associated Press* article, "Emmert says the stipend bears no comparison to offering a salary to a student-athlete, essentially making him or hear a paid employee of the university.  'We're still supporting them as students, not as somebody we're paying to play a game,' said Emmert, a former president at the University of Washington."

196.   In October 2013, the NCAA issued a press release referring to its Division I Leadership Council having convened a meeting on October 24, 2013, in Indianapolis.  The NCAA stated that competitive balance was not impacted by a less restrictive version of its current price-fixing, stating:  "Council members agree that the true 'level playing field' between schools cannot be achieved by making rules that limit the ability of schools with more resources to use them.  Members stress that is some areas rules could become more permissive to allow schools who can afford to take advantage of the flexibility to do so."  The press release continued:  "Many [Council members] believe that student-athlete benefits, including a change in the definition of a full athletics scholarship to include the full cost of attendance, could be an area of compromise."

197.   A September 25, 2013 entry on the National Association of Collegiate Directors of Athletics (NACDA) website, under the slogan "315 Division I Programs – ONE VOICE" states:  "NACDA President Mike Alden, athletics director at the University of Missouri and DIA[17] Athletics Directors' Association President Morgan Burke, athletics director at Purdue University, are serving as national spokesmen for all

---

[17]   "DIA" or "Division I-A" is a Subdivision of NCAA Division I college athletic programs. Division I-A, also referred to as the Football Bowl Subdivision, includes the principal football schools.

351 Division I programs." The entry continues: "The National Association of Collegiate Directors of Athletics (NACDA) and the IA Athletic Directors' Association, in addition to NACDA's Affiliate Associations, the Football Championship Subdivision Athletics Association and the Division I-AA Athletics Directors Association (DI-AA ADA), are working as a cohesive unit in developing recommendations that will help improve the governance of intercollegiate athletics." The NACDA website links to the transcript of a teleconference, dated September 27, 2013, which contains the following exchanges—again under the slogan "351 Division One Programs-ONE VOICE"—explaining that the competition discussed prices and came to an explicit agreement that the current price fix was not necessary, but that actual competition would not be permitted by cartel rule:

> **Q. Morgan, obviously the statement the statement the other day kind of speaks for itself, but where does your group come down on potential cost-of attendance stipends for student athletes?**
>
> MORGAN BURKE: Well, I think that's a subject that's going to get a lot of debate, has gotten a lot of debate, as people have looked at miscellaneous expense allowance. We're committed to trying to make sure the resources are needed for a quality student-athlete experience are there.
>
> Certainly if you back into the 1960s, there was such a thing called laundry money, incidental money given to student-athletes. That went away in the mid '70s. I think you're going to see a question occur on that topic.
>
> ***
>
> **Q. In the statement the other day, you address the integrity issue that needs to be handled effectively, enforcement. What are some of the recommendations you've been making beyond what is already being done at the NCAA level?**
>
> MORGAN BURKE: I'm a big supported for what the NCAA stands for. Again, we are the NCAA.
>
> ***

- 62 -

COMPLAINT

**Q. Mike, in the statement you put out the other day, you said, Pay-for-play is not part of the amateur setting, there's no place for that. You and the SEC have said before that you'd be for exploring stipends and things like that. How do the two opinions vibe and how to they play into each other?**

MIKE ALDEN: I appreciate that. You know, what I had said earlier on this call, but also is we don't talk about pay-for-play. Wherever that's come from, whoever has created that terminology, that hasn't been necessarily anything that we've either talked about at Mizzou or talked about as athletics directors or certainly from an SEC standpoint.

What we've talked about is exploring the opportunity for a full cost of attendance. I used the example a little bit earlier, I'm going to reiterate it. I'm using my son as an example. Jake is a freshman here at Purdue. When we came here as his parents this summer, they showed us what our tuition, fees, books, room and board would be. They said, That's not what it's going to cost him to go to school at Purdue, it's going to be a little bit more. His full cost of attendance, as parents, you need to budget a little bit more because he's probably going to come home twice, he needs incidental expense money, laundry money, whatever it may be.

That's the area all of us are looking at to explore. How do we have an opportunity to really look at what term, at what most schools term, not athletics, most schools of higher education term 'a full cost of attendance'.

**F.     NCAA Conferences' Statements Regarding the Stipend Proposal**

**1.     The Pac 12**

198.    Absent the current restraint, the Pac 12's members would make competitive offers in the relevant market for at least the full Cost of Attendance. The Pac 12's views of amateurism or competitive balance would not be harmed were such competitive offers made in that market.

199.    On June 15, 2011, the *Denver Post* published an article containing interviews with Pac 12 Conference Commissioner Larry Scott and other Pac 12 member institutions. It stated:

[T]he issue of athletes getting shortchanged by major-college football's billion-dollar business has pushed Scott to seek an increase in scholarship money for every varsity athlete on a Pac-12 campus.

- 63 -

'It's a question of priorities, and sometime you have to prioritize what's right,' Scott said. 'I think this is an issue of principle. And we're going to have to advocate for it.'

Scott broached the topic with Pac-12 athletics directors at their recent conference meetings. His pitch received mixed reviews. The athletic directors are ecstatic about getting about $20 million a year in television revenue per school once the new TV contracts kick in, but many will need that money to soak up red ink.

Increasing scholarships for tuition that is rising rapidly on many campuses would put it right back.

'Morally, I think it's the right thing to do,' Oregon State athletic director Bob De Carolis said. 'But there are a lot of other issues and a lot of ways to get to it.'

Scott presented hard data in Seattle. He said the shortfall between the amount of athletic scholarship and actual living expenses—termed 'cost of attendance'—is $2,000 to $4,000 per year per student per school year.

'Our concern is kids from underprivileged backgrounds who literally have trouble covering cost, have a meal, have a little spending money,' Scott said. 'That's a concern.'

\*\*\*

The move could provide an uneven playing field.

'I don't think there is an even playing field,' Scott said. 'There's not an even playing field in TV exposure. There's not an even playing field in coaches and coaches' salaries. There's note an even playing field in stadiums.'

\*\*\*

'I think the kids need more money, period,' said Washington State football coach Paul Wulff. 'They say they can work a job, but it's unrealistic for what we ask these guys to do.'

Wulff said he advocates providing a stipend of about $200 a month.

'The only reason I said that is to make sure they can eat,' he said. 'In my opinion, I'd rather not give them any more money but have the ability to

- 64 -

feed them two meals a day minimum every day.  I don't want to hear a kid say, 'Coach, I don't have enough money to eat.'  It harms their performance.'

It's a long way from fruition, but the debate won't go away.  Scott will make sure it won't.

'No one relishes the idea of increased funding,' Scott said.  'By the same token, we are as a conference at a level in terms of resources coming and a conference that likes to stand for doing things the right way, that it's the right thing.'

200.   On March 8, 2012, *Sports Illustrated* quoted Pac 12 member Arizona State president Michael Crow as stating:  'I had one of those scholarships as an undergraduate, but it was an ROTC scholarship.   Thirty-nine years ago, that scholarship paid me $100 month of spending money because it was the estimate then of what I needed to take care of my incidental expenses.  And that was 39 years ago. This proposal [athletic grant-in-aid cost of attendance / stipend proposal] is not dramatically different than that.'

201.   The *Sports Illustrated* article included comments from Pac 12 member University of Washington president Michael Young, stating that "when his school prepares academic scholarship package, it bases the amount awarded on the cost-of-attendance figure it reports to the federal government.  So a student on a full academic scholarship to Washington, he said, would receive more money than a student on a full athletic scholarship.  Young also noted that the student on an academic scholarship can get a job, while employment opportunities for athletes are limited by available time and by NCAA restrictions.  'The kids who are on solely need-based aid can basically work 20 hours a week or whatever and earn a little pizza money or earn a little money for tattoos or whatever they want,' Young said, tongue planted firmly in cheek.  'Our athletes, on the other hand, work 40-50 hours a week for the school, and they don't get anything except what these other kids get without having to work for it.  It seems to me

when one thinks about simple equity, from that perspective, it's hard to argue that these kids shouldn't get something.'"

202.    A January 6, 2013 *Associated Press* article further reported:   "'The problem is scholarship rules have lagged behind the times,' said Pac 12 Conference Commissioner Larry Scott, now in his fourth year on the job.   His conference, like most major ones, supports a stipend.   'The scholarship rules don't allow you to cover the full cost of attendance,' he said.   'Doesn't cover things like miscellaneous meals, trips home, clothes and other things.   For me there has been a gap.   This does not cross the philosophical Rubicon of paying players.'"

203.    On June 3, 2013, the *Los Angeles Times* reported on the Pac 12 summer meeting in Park City, Utah stating:   "The full cost of attendance issue is not going away.   Several major conferences, including the Southern Eastern [SEC] and Pac-12, favor a plan that will use increased television money to compensate their athletes with an additional scholarship stipend… 'I'd like to think it could happen under the current structure,' [Pac-12 Conference Commissioner Larry] Scott said of the stipend.   'This is clearly the right thing.'"

204.    On July 25, 2013, *Sports Illustrated* SI.com reported that "[t]he big five conferences [PAC-12, ACC, Big 12 and Big 10] want to be able to give the stipend to all scholarship athletes."   The article quotes Pac 12 Commissioner Larry Scott as stating that, "'[s]chools that have resources and want to be able to do more for the student-athletes are frustrated, concerned that we're being held back from doing more for the student-athlete in terms of the stipend.'"

205.    On July 27, 2013, the *Denver Post* reported on the Pac 12's preview at Sony Studios, in Culver City, California, stating that Pac-12 Conference Commissioner Larry "Scott is fully behind the cost-of-attendance stipend most of the smaller schools can't afford.   A figure of $2,000 per scholarship athlete for a school year has been mentioned.   It remains in the discussion stages.   'This must be addressed,' Scott said. … 'It's time to acknowledge that one size does not fit all and we need more flexibility

in the system,' Scott said.  'We must design a structure that allows for appropriate differences based on priorities and resources throughout the NCAA.'"

206.    On November 24, 2013, the *New York Times* quoted Larry Scott as stating "'[t]here's a strong feeling we need to loosen up the reins of what the high-resource conferences can do for student athletes.'"

207.    On May 7, 2014, *USA Today* reported that "[t]his October will mark the third anniversary of NCAA president Mark Emmert unveiling a proposal that would have allowed schools to give college athletes a stipend of up to $2,000 per year."  The article continued:  "Pac-12 commissioner Larry Scott confirmed that the current focus of those five leagues [the Power Conferences] is a scholarship that covers the full cost of attendance rather than a stipend."  According to the report, Scott said:  "'I think at some stage we'll plan to have financial aid officers and athletics administrators representing the 65 schools together discussing a common approach of how to go about it.'"

208.    A May 20, 2014 *Associated Press* article reported:  "Pac-12 university presidents have sent a letter to their colleagues at the other four major football conferences calling for sweeping change to the NCAA model and autonomy for those leagues.  A copy of the letter was obtained by the Associated Press on Tuesday night. It was sent last week to the other 53 university presidents from the Southeastern Conference [SEC], Big Ten, Big 12 and [ACC]….  'We acknowledge that the core objectives could prove to be expensive and controversial, but the risks of inaction or moving too slowly are far greater,' the letter reads.  'The time for tinkering with the rules and making small adjustments is over.'  [Pac 12 member] Arizona State President Michael Crow told the AP that his counterparts in the Pac-12 are "not happy with where things are going.  We're not happy with the nature of the debate out there.  And we felt like our voice is not well understood.'  …The full list of proposals included in the latter are:  --Permit institutions to make scholarship awards up to the full cost of

attendance. …Crow said the decision by Pac-12 presidents to send the letter was unanimous and the initial feedback from university presidents has been positive.”

209.   On May 21, 2014, the *Associated Press* further reported that “[Pac 12 Commissioner] Scott said he doesn’t expect much pushback on the issue from schools in small and mid-major conferences.  Asked if the autonomy initiative could create a bigger divide between conferences, Scott said most collegiate leaders – even those from non-major conferences – believe that idea is outdated.  ‘One size fits all doesn’t work anymore,’ Scott said.  ‘The conferences that can afford to and want to do more for student-athletes ought to be able to do it.  I’d be a little surprised if that view were still out there.’”

### 2.    The Southeastern Conference

210.   Absent the current restraint, the SEC’s members would make competitive offers in the relevant market for at least the full Cost of Attendance.  The SEC’s views of amateurism or competitive balance would not be harmed were such competitive offers made in that market.

211.   On March 8, 2012, *Sports Illustrated* reported:   “The debate [among NCAA Division I members regarding the stipends] began in earnest last summer after a group of presidents at an NCAA retreat proposed a rule that would allow conferences to choose whether their schools could offer athletes up to a $2,000 annual stipend to help defray the difference between their athletic scholarships and the actual cost of attendance.   The proposal came after a presentation that showed the exponential revenue growth in college athletics in the past generate.  ‘They showed where it has been spent,’ [SEC member University of] Florida president Bernie Machen said.  ‘It has been spent entirely on facilities and coaches’ salaries.   The amount spent on students has not increased at all after all this additional money has gone into college sports.  That’s just embarrassing.’”

212.   On March 5, 2012, sportingnews.com reported an interview with SEC member University of Kentucky men’s basketball coach, John Calpari, who when

asked what he would change with the NCAA if he had the power to do so, stated: "There would be a stipend, probably in the area of $4,000 to $5,000, and I'm talking men and women, all athletes."

213.   A *USA Today* article, on January 6, 2013, quoted SEC member University of Alabama football coach Nick Saban (now making in excess of $7 million per year) as stating: "'I don't think there's any question about that fact that something . . . I do think that something should be done to enhance the quality of life of student-athletes that are on scholarship because in our sport especially, there is a socioeconomic groups that struggle a little bit, even with a scholarship, because there is a cost associated with going to college that is beyond room, board, tuition and books.'"   According to the article: "Saban pointed to the windfalls by conference TV networks and the coming college football playoff as a compelling reason for the discussion.   'I think especially where we've sort of gotten to from a business perspective relative to the financial end of things that there isn't really a good reason that the student-athletes who create that should not share in that to some degree.'"

214.   In a January 6, 2013 *Associated Press* article, SEC Commissioner Michael Slive offered the following with respect to the proposed $2,000 stipend: "'It doesn't strike me as a drastic definition.   There is a fixed definition for a scholarship.   There's no reason why it shouldn't be reviewed.'"   Commissioner Slive continued:   "'I do understand the economics, that it might be more difficult for some than others, but for those that can do it, it's the right thing to do and that ought to be the guiding factor.'"

215.   Interviewed on April 29, 2013, Commissioner Slive offered the following with respect to the NCAA's failure to allow a $2,000 stipend:   "It's a disappointment that it's not taken care of yet.   We truly believe that we ought to do more for our student-athletes than just the room, board, books and tuition.   We're hopeful that we can continue to make that work . . . I think it's fair to say it's an idea that's not going to go away."

216.   On July 16, 2013, ESPN.com reported that SEC member "University of South Carolina [football] coach Steve Spurrier gave a peek behind the curtain of the annual Southeastern Conference coaches meetings Tuesday, revealing that the league's coaches voted unanimously that every student-athlete in basketball and football should be given a stipend affording their parents travel expenses to and from games."   The article continued:  "The league's elder statesman among football coaches said it is only right that those player who generate the school so much money should be given what would amount to a minor benefit."   The article quoted Mr. Spurrier as stating:

> 'We believe those two sports, the income producers, those players-most of them come from lower-income families—that we should provide some expense money so their parents can go to the games—lodging, travel, meals, what have you, Spurrier said.  'We're only talking about in football like $300 a game, basketball, would be a little less, where the players in the course of the year have $3,600-$3,900, depending on how many games you play, just to have a little bit of pocket money and their parents can have money to come to the games.'[18]

The article continued:  "Spurrier has pushed for stipends for the past two years, and reiterated Tuesday that all the SEC football and basketball coaches agreed their players deserved what would amount to pocket change compared to the money generated from ticket sales and television revenue."   According to the ESPN.com report, "Spurrier said it wasn't 'pay-for-play,' but rather expense money.  In fact, Spurrier said the coaches would pay for the expenses out of pocket if need be."

217.   On May 26, 2014, CBSSports.com reported:

> SEC Commissioner Mike Slive is a history buff by nature.  So when Slive considers major moments in NCAA history, he immediately thinks of Teddy Roosevelt creating the NCAA in 1906 to curb football deaths;

---

[18]   As reported in SF Gate on January 6, 2015, the NCAA announced a pilot program to allow schools to reimburse family members up to $3,000 for travel, hotel and meals for travel-related expenses to the semifinals, and up to $4,000 for the title game, during the men's and women's Division I basketball tournaments.  SFGate.com, "NCAA allows travel aid for athletes' families (Jan. 6, 2015), available at http://www.sfgate.com/collegesports/article/Stanford-s-Andrus-Peat-to-enter-NFL-draft-5997700.php.

the Association for Intercollegiate Athletics for Women folding into the NCAA in 1981; and the NCAA's football TV deal being declared illegal in NCAA v. Board of Regents of the University of Oklahoma in 1984.

In Slive's mind, the current issues about providing new benefits for college athletes can be added to the Mount Rushmore of NCAA moments.

'I consider this period of time one of the historic moments that all of us are witnesses to – and evolutionary change where we put the student-athlete first and we build our philosophies on the student-athlete rather than the so-called level playing field,' Slive said. 'I don't know how this comes out, but I'm optimistic the evolution will continue.'

\*\*\*

Providing athletes with a cost-of-attendance stipend is one of the most prominent benefits being discussed. Slive said the SEC must first determine for itself how it feels cost of attendance—the value of attending college beyond what's covered in a scholarship—should be calculated. Then once the 65 schools from the power-five conferences meet, one of the next questions becomes whether conferences mandate that their schools provide cost-of-attendance stipends and to which athletes, Slive said.

\*\*\*

Slive said the right question about providing new benefits to athletes should be what's best for athletes in all sports, not just football and men's basketball players.

'That's the way to think about this,' Slive said, 'but most of us think of it the other way.[19]

### 3.      The Big Ten

218.    Absent the current restraint, the Big Ten's members would make competitive offers in the relevant market for at least the full Cost of Attendance, and its views of amateurism or competitive balance would not be harmed were such

---

[19]    Jon Solomon, '*Mike Slive: New benefits to athletes will be historic NCAA moment*,' CBSSports.com (Jan. 3, 2014), available at http://www.cbssports.com/collegefootball/writer/jon-solomon/24572932/mike-slive-new-benefits-to-athletes-will-be-historic-ncaa-moment.

competitive offers made in that market. The Big Ten, however, also has indicated at time that it intends to do so only subject to an anticompetitive agreement with its competitors.

219. For example, on May 19, 2011, ESPN.com reported:

Big Ten officials discussed a proposal that would pay athletes to help cover living expenses on top of their scholarships during the league's spring meetings this week.

The idea, which is backed by current NCAA president Mark Emmert and was favored by late NCAA president Myles Brand, is to bridge the gap between what athletic scholarships pay and other expenses like transportation and clothing. That difference has been estimated at between $2,000 to $5,000 per player.

Big Ten commissioner Jim Delany said league athletic directors and officials have seriously discussed whether they should use some of their growing TV revenue to pay athletes more.

'Forty years ago, you had a scholarship plus $15 a month laundry money,' Delany said. 'Today, you have the same scholarship, but not with the $15 laundry money.'

'How do we get back more toward the collegiate model and a regulatory system that is based more on student-athlete welfare and it is on level playing field, where everything is about a cost issue and whether or not everyone can afford to do everything everybody else can do?' Delany asked.

Delany stressed that the Big Ten was merely at the discussion stage, but he added the league is interested in talking to other conferences to see if they also favor such a plan. He acknowledge many schools and conferences across the country couldn't afford to cover those additional expenses, which could run about $300,000 a year just for football and men's basketball players alone.

But some Big Ten officials say if they can help out their athletes, then the concept of using the same rules for all teams should be abandoned. Ohio State athletic director Gene Smith said the stakes are simply higher for schools like his for those in the MAC or Sun Belt.

- 72 -

'The reality is, if there's a cost of attendance and you can't afford it, don't do it,' Smith said.  'The teams you're trying to beat can't do it either. Don't do it because Ohio State's doing it.  That's one of the things schools at that level get trapped into thinking.'

220.   As a further example, on March 8, 2012, *Sports Illustrated* reported:  "'I think we should go farther than $2,000' [Big Ten Conference member, University of Nebraska-Lincoln Chancellor Harvey] Perlman said.  'I think the NCAA ought to allow us to give up to the cost of attendance, whatever that is.'"  The article went on, noting that "Nebraska's Perlman, who fancies himself a deregulator, has a solution.  If schools don't want to pay the extra scholarship money, they shouldn't.  But he would ask that they not bother trying to stop other schools from paying it.  . . . 'You can tell me that I can't give them bagels with cream cheese and I can't give them more scholarships and I can't do this and I can't do that, and I follow those rules,' Perlman said.  'But then what I do to recruit competitively is I spend the money on other stuff. So I build facilities where there is no limit no limit on that, and I make those facilities far beyond what normal students live in because there's no limit on that.  There's a standard understanding about regulatory environments that if you regulate something, people will move to the part of their activity that isn't regulated.'"

221.   On July 24, 2013, the *Chicago Sun Times* reported Big Ten Commissioner Jim Delany as stating that "'a miscellaneous expense needs to be implemented, and it needs to be implemented in a way that allows the student to engage in athletics and also to receive support from the institution above the scholarship, up to the cost of education.'"

222.   In an August 7, 2013 *USA Today* report, Commissioner Delany is quoted as stating: "'My line is cost of attendance, and that's as far as I'm willing to do.  After cost of attendance, then I think you're into another game, pay for play, and I'm personally not in favor of it.

223.   On September 26, 2013, *USA Today* reported that Commissioner Delany believes there is a need to "do everything we should do to define a fair package that

fits the 21st Century."  Delany's "preferred model," according to the report, "would include the ability for those conferences to have the autonomy to legislate their own rules without—or with much less regard for—the concept of an artificially 'level playing field' for schools with fewer resources.  The wealthier schools would be able to provide more benefits to athletes, such as stipends to help cover the full cost of attendance and miscellaneous expenses.  Delany also suggested as examples expanded educational opportunities and allowing schools to pay expenses of players' parents on road trips.  'There are things we can do to prioritize their experience,' he said.  'But I feel as strongly as I did 20 years ago it's not pay-for-play.'

224.  Tom Osborne, the then Athletic Director of the Big Ten member University of Nebraska in 2012, and formerly a football coach at that institution, stated in an *Associated Press* interview published December 25, 2012, and now appearing on the NCAA's website:

> I would hope student-athletes can be put somewhere at the forefront of the agenda.  I find it odd that you see the escalation of dollars yet there seems to be a lot of controversy over providing student–athletes with a $2,000 stipend.  It doesn't quite compute.  It seems to me that the athletic scholarship should be cost of attendance, not just room, board, books, tuition and fees….

225.  SI.com, in an article published November 11, 2013, discussed Nebraska's Chancellor Harvey Perlman, "who is the Big Ten's representative on NCAA reform" and quoted Perlman as stating:  "'The fact is that with all this revenue that we have, we can spend it on anything we want under current NCAA regulations, except to benefit student-athletes.'"  Perlman continued:  "'That's where we're regulated and prevented from doing things.  I'm not saying we're going to pay them.  None of us would agree to that.  But there are a variety of areas to have opportunities among the five to consider the rules we want to live with.'"

226.  On May 7, 2014, *USA Today* published an interview with Big Ten Commission Jim Delany, in which Delany is reported to have stated:  "'I think the next

frontier really, is the restructuring of the NCAA and getting our house in order.  There are some things we haven't been able to do that we need to do…. In my view, that means getting costs of education legislation through, getting some improvement in time demands….'"  Delany continued:  "'I think there's a general recognition that there are some areas—student-athletes welfare, in particular—where there needs to be some flexibility in rule-making.  I think there's a general recognition that that's the case.  What I don't feel particularly enthusiastic about, but we're still working on, is the definition of majoritarian/super-majoritarian bar for passage.'"  Delany went on: "'Now people are suggesting, if you want to undo [NCAA rules] through autonomy [of the Power 5 Conferences], you need 2/3 of all votes from the autonomous group and four or five conferences….  You don't do basic business with those kinds of majorities….  We don't want to create the bar so high that (there's) quasi phantom reform.  We want real reform.'"  And, "'in implementing this rules,'" Delany continued, "'if we get them passed, we want to have the authority to interpret them and to waive them and enforce.  We don't want to turn it over to NCAA staff. …Sometimes, common sense requires that the rule not be applied.  We want to able to control that.'"  When asked "On a conference level?  School level?" Delany responded "'Group of five level.  .. [W]e've got to have the autonomy to make the rules for the 21st century Division I athlete.'"  When asked "What are the [areas of autonomy] you feel are imperative to change?" Delany stated:  "'There are five or six of them.  I'd say cost of education.  I think a lifetime trust that allows students to come back, get their degree.  I think real change in time demands….'"  Delany continued:  "'In the 12st century, it's painfully obvious that we need to change.  It's painfully obvious it's not all a level playing field, and that a lot of the level-playing field philosophy is under attack.  I would rather have us change it than have it not change or change for us.'"

227. On May 9, 2014, a *Quad City Times* report included the following quote from Big Ten member University of Iowa President Sally Mason, chair of the Big Ten's Council of Presidents and Chancellors:  "It's certainly something we want to

keep an eye on, and we want to have the latitude…to make it so the kinds of things that athletes at Northwestern were asking for, whether it is better health care for them, whether it is full cost of education, the kinds of benefits, these are the kinds of things we have been wanting to do.  Programs like Iowa and all of those in the Big Ten, we're resourced well enough that we can do these things and we should be allowed to do these things.'"

228.   On May 15, 2014, mLive.com reported that "[a]ccording to [Big Ten member] Purdue athletic director Morgan Burke…providing players with extra spending money isn't an issue about budgets—it's an issue of right and wrong.  'It's fundamentally the right thing to do,' Burke said Wednesday during the Big Ten's spring meetings outside Chicago.  'It's got to be done for men and women, it's got to be done for Olympic sports and non-revenue sports.  It's the right thing to do.  The reality is, this is fundamentally fair.  And so we'd better find the money.  We find the money for lots of other things, we'd better find the money for this.'"  Burke continued: "'But how about if mom and dad are both working, they'd don't qualify for Pell and they haven't good two nickels to rub together (while in college).  And, yet, we're sitting here with phenomenal growth in our media revenue and rights agreements— (paying them that money) isn't doing anything more than you should be doing.  It's fair.'"  (parentheses in original).

229.   On June 24, 2014, the Big Ten issued a statement that read, in pertinent part, as follows:  "Today, the presidents and chancellors of the Big Ten schools issue the following statement signed by the leaders of each institution:  …We must do whatever it takes to ensure that student-athlete scholarships cover the full cost of a college education, as defined by the federal government.  That definition is intended to cover what it actually costs to attend college."

### 4.     The Big 12

230.     Absent the current restraint, the members of the Big 12 Conference would make competitive offers in the relevant market for at least the full Cost of

Attendance.  The Big 12's views of amateurism or competitive balance would not be harmed were such competitive offers made in that market.

231.    As one such example, on April 17, 2013, Big 12 Commissioner Bob Bowsly stated the following in a television interview on the Longhorn Network:

> I served on the NCAA's Financial Aid and Amateurism Committee 30 years ago, and we came up with the revolutionary idea that it should be room, board, book, tuition and fees and $2,000 a year, so not much has changes over the last decades.  But, I really think we all understand that it costs more than room, board, books and tuition and fees to go to college, so I could certainly advocate for some measure of incremental payment to student-athletes.…  if we're to come up with a plan, that especially on a need basis, would put some additional money in the hands of student-athletes, and when I say student-athletes, I don't just mean football player or basketball players.  I think if you apply any form of labor theory of value, swimmers work just as hard as the basketball players, the track athletes work just as hard as the football players do, I think we have to do it for all student athletes, men and women, on a need basis, and if goes above $2,000 per year per student athlete, so be it, I think it's a great thing to do for the young people that populate our programs, they all work hard, and they all deserve the consideration.

232.    In a June 2, 2011 Associated Press report, Big 12 member University of Texas Athletic Director, DeLoss Dodds, commenting on the issue of increase the value of athletic scholarships to the cost of attendance, stated:  "'We're for it.  It's a positive step and I think doing something for student-athletes is a positive thing."

233.    In a June 27, 2011 *Dallas Morning News* report, Big 12 member Texas A&M Athletic Director, Bill Byrne, stated:  "'I've been in favor of total cost of attendance forever, whether I was working at a have or have not [school].  So many student-athletes come from disadvantaged backgrounds and have to pay their way to school or laundry or movies.  If you really care about the welfare of student-athletes, dig a little deeper."

### 5.    The Atlantic Coast Conference

234.    Absent the current restraint, the members of the ACC would make competitive offers in the relevant market for at least the full Cost of Attendance.  The

- 77 -

ACC's views of amateurism or competitive balance would not be harmed were such competitive offers made in that market.

235.   As an example, on July 12, 2013, ESPN.com quoted ACC Commissioner John Swofford as follows:  "'I am for looking very diligently at a way to enhance the scholarship itself, whether it's need based, whether it's based on a simple stipend that once existed or some other way to approach it, whether it's going to the full cost of attendance.'"

236.   Similarly, on September 10, 2013, *Bloomberg* quoted ACC member University of Notre Dame Athletic Director, Jack Swarbrick, on the issue of proposed NCAA reforms as stating:  "'On one end, there are schools that are fully integrated into the university, and on the other, it's almost like licensing the university name.  In any business association, once members don't have a common business model, you have enormous tension.'"

237.   On October 16, 2013, the Durham North Carolina newspaper, *The Herald Sun*, published a report in which Commissioner Swofford is quoted as stating:  "'I'm for enhancing fundamentally the concept of the athletic grant made that we have now. . . . [W]e can't live with our heads stuck in the sand.'"

### 6.   Additional Admissions By Defendant Conferences and Their Members that the Challenged Restraint Injures Competition

#### a.   American Athletic Conference

238.   On February 15, 2014, the Associated Press reported:   "The commissioner of the American Athletic Conference said Saturday that his schools are committed to matching the power conferences when it comes to providing stipends to athletes … [Commissioner] Mike Aresco, who spoke before Saturday's basketball game between Memphis and UConn, says the American is committed to provide a full cost of attendance stipend if that is what is eventually approved.  'Whatever it ends up being, whether it is a fixed amount (or not), we have committed as a conference,

pledged as a conference, that we're going to do it,' he said. … 'We have every intention of being a conference just like those of the other five, Aresco said."

239.    On May 6, 2014, CBSSports.com reported Commissioner Mike Aresco as stating:  "'Whatever the cost of attendance looks like, our conference has to embrace it.  Our competitiveness going forward is really at stake here.  We know it.'"

240.    On June 2, 2014, The New Orleans Advocate reported that "[n]ot wanting to get left behind, the American Athletic Conference, including incoming member Tulane, on Friday committed itself to following the lead the so-called Power Five conferences in their proposed NCAA governance changes, including supplying the full cost of attendance for athletes.  'We are working to position ourselves with the five equity conferences on this,' AAC Commissioner Mike Aresco said at the end of the league's spring meetings in Key Biscayne, Fla."

### b.    Conference USA

241.    On August 20, 2013, USA Today reported that "Conference USA commissioner Britton Banowsky endorsed the idea of student-athletes receiving a stipend to cover the 'full cost of attendance' in July, and the league's university presidents and athletics directors follows suit by supporting that notion at a retreat this past week in Irving, Texas.  New Louisiana Tech athletics director Tommy McClelland reiterated no official vote or legislation passed, but McClelland said C-USA members unanimously agreed to support a stipend should one become available.  'We're supportive of it in the event that (a stipend) would be presented that covered the full cost of attendance,' McClelland said.  'Conference USA members presented a united front in support of it.'"

242.    On June 23, 2014, the Charleston Daily Mail reported Conference USA Commissioner Banowsky as stating:  "'I know that our conference specifically believes that student-athlete packages should provide up to the cost of attendance.  I think the idea that student athletes have the resources necessary to attend the university, we that that's appropriate.'"

### c. Sun Belt Conference

243. On January 4, 2013, CBSSports.com reported that "Sun Belt [Conference] schools are all in when it comes to paying stipends, says commissioner Karl Benson, who doesn't expect the issue to muscle out the smaller conferences. 'Schools will find that they can't afford not to,' Benson said."

### d. Mountain West Conference

244. On May 4, 2014, the on-line version of the San Diego Union-Tribune, utsandiego.com, reported "[t]he Mountain West [Conference] Commissioner Craig Thompson told ESPN this week that he believes each school should have the right to dole out athlete benefits based on what it can afford."

### e. Mid-American Conference

245. In an May 7, 2014 article in *USA Today*, it was reported that Mid-American Conference member Northern State Illinois University "will have to find a way to go along with whatever the Power 5 decide" regarding cost of attendance stipends for student athletes. "'We've got to increase the widget sales. We've got to build a matter mousetrap,' Northern Illinois athletic director Sean Frazier said. 'If we want to be competitive, we've got to do what we've got to do. Our league, we've got good programs and I think we're all concerned that we can't miss an opportunity to be a part of the conversation....'"

246. On June 1, 2014, Blade.com reported that Mid-American Conference member "University of Toledo athletic director Mike O'Brien is … in favor, he said, of 'whatever can be done to better the environment for student-athletes.' …Mr. O'Brien is in favor of Mid-American Conference schools paying athletes a cost-of-attendance stipend. 'It's something that each institution is going to have to look at,' he said. 'But given the fact that we recruit against various conferences, obviously we have to look at that and in turn be in favor of it.'"

### 7. Additional Admissions from Other Division I Conferences and Their Members that the Challenged Restraint Injures Competition

#### a. Atlantic 10

247.    On June 11, 2014, *USA Today* reported that "[t]he A-10 Council of Presidents met Wednesday morning to discuss issues surrounding NCAA governance and potential student-athlete welfare-reform, among other topics.   The conference supports the idea of a new NCAA governance model and plans to adopt at least some of the measure that will improve athlete well-being, particularly those related to player safety, education and the full cost of attendance.   A-10 Commissioner Bernadette McGlade said the league's presidents voted unanimously to adopt cost-of-attendance stipends when the measure was initially introduced in 2011."

#### b. Big East Conference

248.    An October 18, 2013 article in the New Jersey *Star-Ledger* reported the following statements by that Big East Commissioner Val Ackerman regarding the stipend issue:  "[T]wo or three thousand dollars, which many say sort of clean up what the landscape is now in terms of impermissible expenses.  If you just gave the players some supplemental money then it would just sort of make it easier and it would reflect some of inequities that student-athletes have if they come from disadvantaged homes. To me it's hard to argue with that.  I think that makes sense to me and in many college sports I think believe that is what's going to happen at some point.  That's going to make its way through and be approved within the NCAA.  So that's one, which I support."

#### c. Metro Atlantic Athletic Conference

249.    On November 4, 2011, the online version of the Albany, New York *Times Union*, timesunion.com, reported:  "The MAAC announced today that it has adopted the NCAA's new "Cost of Attendance" bylaw that allows schools to add $2,000 to athletic scholarships.  The increase will be mandatory in men's and women's basketball and optional, by each school's discretion, in other sports that give our full

- 81 -

scholarships. The NCAA bylaw was passed last week to cover miscellaneous expenses incurred by athletes beyond their scholarship, which covers only tuition, room and board and books."

### d. Horizon League

250. On November 7, 2011, ESPN.com reported: "The Horizon League announced Monday that its athletics directors have approved the addition of $2,000 in cost of attendance allowances for basketball scholarships, reacting to the NCAA last month voting in favor of allowing conferences to make that decision. 'Our operating regulations reflect our longtime league-wide philosophy of providing NCCA-determined maximum scholarship amounts in the sports of men's and women's basketball programs,' Horizon League commissioner John LaCrone said in a statement. 'This vote by our athletic directors supports the continuation of that strategy, which has a record of success.' The Horizon League's most high-profile program is Butler, and athletic director Barry Collier told me over the summer that the school would be able to cover the cost of attendance for its student-athletes. 'Pay-for-play is one thing,' Collier said. 'Providing the cost of attendance defines something different philosophically. It's not enough to stop us from doing it. We would do it if it passed. We could handle the additional cost."

### G. Other Statements Supporting the Stipend Proposal

251. On June 28, 2007, basketball Hall-of-Famer Oscar Robertson wrote in an Op-Ed piece published in the *New York Times* that "College athletes should also receive a modest stipend and more realistic expense money. If athletes have to struggle to get by, of course they will want to turn pro as soon as possible. They're also more likely to accept money from agents who want to sign them, although agents aren't the only people who slip money to college athletes. (Signing with an agent makes players ineligible for the college game, whether or not money has changed hands—but coaches are allowed to collect fees for referring agents to players!)."

252.    On March 29, 2013, the *New York Times* reported that "Gary Williams, who has been a [men's basketball] head coach at multiple colleges, most notably at the University of Maryland, said "I'd be the first one to say players should get a stipend. At a big-time program, you're generating not just the dollars you bring in but the interest of your alumni that will give money to the school, not just to the athletic department.  And the applications increase, which is really important for the school." Mr. Williams also served as the head coach at Ohio State University, Boston College, and American University.  In 2002, he coached the University of Maryland to the national championship.  He retired from coaching after the 2010-11 season, and now serves as a college basketball analyst for the Big Ten Network, owned by powerful NCCA member the Big Ten Conference.

253.    On April 9, 2014, the Wall Street Journal reported that "[University of the] Pacific athletic director Ted Leland, a former Stanford [University] athletic director and longtime NCAA committee member, said Wednesday that the NCAA needs to find a way to share revenues with student-athletes before the governing body of college sports is ordered to do so by the courts."  The article continued that Leland, speaking on a panel on the future of college sports at Stanford University, said:  "'I'm afraid if we don't figure out the model, we're going to get told what the model is.  If a federal judge looks at this, I can't imagine we wouldn't come out significantly scarred."

> **H.    NCAA Members' Statements against the Stipend Proposal Show that Opposition is Not Based on Valid Antitrust Defenses, but Rather Serve Primarily as Cost-Cutting Efforts or as Means of substituting the Judgment of the Cartel for that of the Market**

254.    In vigorously opposing the stipend rule, NCAA member institutions laid bare their anticompetitive motivations, and have repeatedly made public statements demonstrating the lack of pro-competitive motives for maintaining the current level of fixed prices. These invalid justifications include a desire to lower costs, a desire to

restrict the choices of athletes in the labor market, or a simple aversion to seeing its labor force with money to spend.

255. The NCAA, in a press release in December 2011 regarding the override vote that suspended the new rule, made clear the decision was made to hold down cartel members' costs, stating that "[o]ther schools who objected to the legislation stated they can't afford the additional expense but feel it will be necessary to find the money to pay for it in order to compete for recruits."

256. The primary motivation of NCAA institutions in repealing the stipend rule was to reduce price competition thereby holding down their labor costs. Moreover, many explicitly saw that the current cap had the effect of denying their athletes choice among a variety of financial aid packages. That is, as Boise State put it: "That tough decision [where to attend college] becomes more complicated when the student and his/her family have to factor in what school 'offers the best deal' versus where they may want to attend if all offers were for one year without the enticement of $2,000."[20] But of course that is no different than price-fixers of consumer products arguing that by fixing prices, they make it easier for consumers to choose the car, or laundry soap, or milk products than best fits their families' needs, independent of price.

### G. Major College Basketball and Division I Women's Basketball Are Highly Commercialized Businesses, not Charitable Endeavors

257. The money generated by the college sports enterprise, presided over and facilitated by the NCAA, is staggering.

---

[20] This and other NCAA member institution comments made to the NCAA in conjunction with the successful effort by NCAA member institutions to repeal the stipend rule, demonstrating the lack of pro-competitive motives by NCAA member institutions for maintaining the current level of fixed prices in the relevant market, are collected in Andy Staples, 'Schools, Not NCAA, Standing in the Way of Positive Scholarship Change,' Sports Illustrated (Dec. 20, 2011), available at http://sportsillustrated.cnn.com /2011/writers/andy_staples/12/20/ncaa-student-athletes/index.html?eref=sihp&sct=hp_t1l_at.

258. In March 2013, ESPN.com published the below information regarding the major NCAA conference's television deals.[21] It explains that "First-tier rights are for football and/or basketball games broadcast nationally. Second-tier rights are for football and/or basketball games not selected by the first-tier rights holder. Third-tier rights are any games not selected by the first- or second-tier rights holders and rights for all sports other than football and basketball and can include digital rights. These rights are often sold on a per-school basis (not negotiated by the conference as a whole) and often go to regional networks (Comcast Sports Southeast, Raycom, or SportsNet New York, for example). They can also be reserved for networks like the Big Ten Network and the Longhorn Network." The information is as follows:

| NCAA CONFERENCE NAME | TELEVISION CONTRACT INFORMATION | DOLLAR AMOUNT |
|---|---|---|
| **BIG 12** | First and second-tier rights, ESPN/FOX, 13 years through 2024-25: | **$2.6 Billion** |
| | Per-year average:<br><br>Per-school, per-year average: | **$200 Million**<br><br>**$20 Million** |

---

[21] Kristi Dosh, '*A Comparison: Conference Television Deals*,' ESPN (March 19, 2013), available at http://espn.go.com/blog/playbook/dollars/post/_/id/3163/a-comparison-conference-television¬deals (last visited Dec, 12, 2014).

| NCAA CONFERENCE NAME | TELEVISION CONTRACT INFORMATION | DOLLAR AMOUNT |
|---|---|---|
| **PAC 12** | First and second-tier rights, ESPN/FOX, 12 years through 2023-24: | **$3 Billion** |
| | Per-year average:<br><br>Per-school per-year average: | **$250 Milliion**<br><br>**$20.8 Million** |
| **SOUTHEASTERN CONFERENCE** | First-tier rights, CBS, 15 years through 2023-24 (negotiations ongoing):<br><br>Second-tier rights, ESPN, 15 years through 2023-24 (negotiations ongoing): | **$825 Million**<br><br>**$2.25 Million** |
| | Per-year average (negotiations ongoing):<br><br>Per-school, per-year average: (negotiations ongoing): | **$205 Million**<br><br>**$14.6 Million** |

| NCAA CONFERENCE NAME | TELEVISION CONTRACT INFORMATION | DOLLAR AMOUNT |
|---|---|---|
| **BIG TEN** | First-tier rights, ESPN, 10 years through 2016-17: | **$1 Billion** |
| | Second-tier rights, Big Ten Network, 25 years through 2031- 32: | **$2.8 Billion** |
| | Select basketball rights: (minimum of 24 games, men's tournament semifinal and championship games), CBS, six years through 2016-17: | **$72 Million** |
| | Football championship game, FOX, six years through 2016: | **$145 Million** |
| | Per-year average: | **$248.2 Million** |
| | Per-school, per-year average: | **$20.7 Million** |
| **ATLANTIC COAST CONFERENCE** | First, second and third-tier rights, ESPN, 15 years through 2026-27: | **$3.6 Billion** |
| | Per-year average: | **$240 Million** |
| | Per-school, per-year average: | **$17.1 Million** |
| **FORMER BIG EAST** | First-tier rights: ESPN, seven years for basketball (2013-2020); six years for football (2014-2020): | **$126 Million** |
| | Second-tier rights: Basketball, BS, six years through 2012-13 (negotiations ongoing) | **$54 Million** |

259.   Among the many beneficiaries of the largest of the television networks are coaches, many of whom receive multi-million-dollar contracts, assistant coaches, university athletics directors, NCAA executives, NCAA Conference commissioners.

260.   A November 6, 2013 *USA Today* article reported on a study of the compensation packages for 126 major football head coaches.  It reported that "[t]he average compensation package for major-college coaches is $1.81 million, a rise of about $170,000, or 10%, since last season—and more than 90% since 2006.  …At this rate, coaches' compensation would more than double in less than a decade." Accompanying the article is a database on each head coach (all figures here are guaranteed compensation, prior to potential bonus compensation, which is also detailed).   For example, according to the article, in the academic year 2013-14, University of Alabama's Nick Saban was to earn $5,545,842; University of Texas' Mark Brown would earn $5,453,750, and University of Arkansas' Bert Bielman would earn $5,158,863.   Another five coaches would earn more than $4 million.  Another nine coaches would earn more than $3 million.  Another 33 coaches would earn more than $2 million in the 2013-14 academic year.[22]

261.   While coaches of women's collegiate teams generally earn lower salaries than coaches of men's teams, Women's Division I college basketball coaches' salaries are still substantial.   University of Connecticut women's basketball coach Geno Auriemma recently signed a $10.86 million contract effective April 2014 through the 2017-18 season.   Under the contract, Auriemma will make $1.95 million per season guaranteed, steadily increasing to $2.4 million in the final year of the five-year

---

[22]   These coaches' salaries skyrocketed even further in 2014.  A December 31, 2014 *Business Insider* article reported that former San Francisco 49ers head coach, Jim Harbaugh, as the new head football coach at the University of Michigan, would be "the second-highest-paid coach in college football next year taking home $7.0 million, trailing only Nick Saban of the University of Alabama ($7.2 million)."   Cork Gaines, '*How Jim Harbaugh's Salary at Michigan Compares to Other Top Coache*s,' Business Insider (Dec. 31, 2014), available at http://www.businessinsider.com/chart-how-jim-harbaughs-salary-at-michigan-compares-to-other-top-coaches-2014-12#ixzz3Obr4yoQz.

contract.[23]   With bonuses and winning championships, which he does regularly, he is likely to eclipse $3.5 million in the final year of his contract.

262.   According to a May 24, 2013 article in Sporting News, University of Notre Dame head women's basketball coach, Muffett McGraw, earned $1.145 million in base salary and other guaranteed compensation during the period July 2011 to June 2012.[24]

263.   Baylor University head women's basketball coach, Kim Mulkey, earned $1.287 million in the 2012-13 season, according to the University's IRS Form 990 (the last year publicly available).   Sherri Coale, head women's basketball coach for the University of Oklahoma, is guaranteed $1.01 million per season, but bonuses and fringe benefits will lift her annual compensation will beyond that figure.[25]   Lindsey Gottlieb, head women's basketball coach for the University of California, Berkeley, is guaranteed more than $485,000 per season plus additional cash bonuses for postseason play in addition to other fringe benefits.[26]

264.   These salaries dwarf the women's Division II head coaching salaries, which average only $44,554.51.[27]   NAIA coaches make significantly less.

265.   Women's Division I assistant coaches command large salaries as well. For example, at the University of Tennessee, assistant coaching salaries for women's basketball ranged from $130,000 to $225,000 in 2012.[28]

---

[23]   '*Geno Auriemma Signs New Deal*,' ESPN (Mar. 27, 2013), http://espn.go.com/womens-college-basketball/story/_/id/9105319/geno-auriemma-signs-new-contract-stay-uconn-huskies.

[24]   http://www.sportingnews.com/ncaa-football/story/2013-05-24/charlie-weis-buyout-notre-dame-19-million-brian-kelly-coach-kansas.

[25]   Berry Tramel, '*Oklahoma Women's Basketball:   Sherri Coale Is More Than A Coach, She's An Icon for OU*,' The Oklahoman (March 6, 2014).

[26]   University of California, '*Addendum to Annual Report on Executive Compensation for Calendar Year 2013*,' available at http://compensation.universityofcalifornia.edu/reports/2013-annual-report-executive-compensation.pdf.

[27] http://grfx.cstv.com/photos/schools/nacda/sports/div2ada/audo_pdf/DIISurveyResults05.pdf.
[28]   '*UT Athletic Department Salaries by Sport*,' Go Vols Xtra (June 23, 2012),

*(Footnote continued)*

266.   NCAA executives themselves share in enormous wealth created by the efforts of college athletes.  For example, the NCAA's 2011 IRS tax return, the most recent publicly available, states that President Mark Emmert received annual compensation of $1,674,095, another executive $977,531, two more above $500,000, three more above $400,00, eight more above $300,000, and for more well above $200,000.   On March 27, 2014, the *Indianapolis Star* reported that 86 NCAA employees earn more than $100,000 per year.

267.   The Conference Commissioners also do very well.  For example, on May 19, 2013, Steve Berkowitz of *USA Today* reported that "Pacific-12 Conference commissioner Larry Scott was credited with nearly $3.1 million in compensation during the 2011 calendar year, according to the conferences latest federal tax return – and he isn't the only highly paid member on his staff.  Scott received $1.575 million in base compensation – $575,000 more than in 2010 – and about $1.5 million in bonuses and other pay. …Deputy commissioner Kevin Weiberg was credited with $563,607 in total compensation, including more than $356,000 in base pay and the rest in bonus or other pay.  Weiberg's total compensation surpassed the commissioners of the Big East Conference and Conference USA.  John Marinatto, the Big East's commissioner in 2011 (he resigned in May 2012) was paid $560,777 in 2011, including $505,000 in base compensation. …That was only slightly more than the total Conference USA reported for Commissioner Britton Banowsky.  Banowsky was credited with $559,242 in compensation, which included $427,153 in base pay.  Scott's compensation is about $300,000 more than that reported for Big Ten commissioner Jim Delany and almost double the nearly $1.56 million total for Southeastern Conference commissioner Mike Slive."

268.   NCAA licenses are another source of enormous revenue.  An NCAA merchandise license allows licensees to produce product leading up to and during its

http://www.govolsxtra.com/news/2012/jun/23/ut-athletic-department-salaries-by-sport/.

89 Championship Events.[29]  Even though the NCAA states that a main objective of its merchandising licensing program is to "[g]enerate revenue to support and enhance NCAA programs and to fund scholarships, programs or services to student-athletes of our member schools and conferences,"[30] and even though the value of these licensing agreements is increasing, a Division I Women's Basketball player still receives only the GIA-capped amount in exchange for her services.

269.  NCAA entertainment licenses are as lucrative if not more so.  "[Video game company] EA Sports is making millions off players after college and players don't get anything," said Mark Conrad, director of sports business specialization at Fordham University.[31]  Again, notwithstanding these enormous revenues, a Division I Women's Basketball player is limited to the agreed-upon and capped GIA amount.

**H.    Former NCAA Executive Director, Walter Byers, Makes Clear in his Book that the Purpose of NCAA Rules is to Fix Prices**

270.  Walter Byers served as the Executive Director of the NCAA for nearly four decades, from 1951 to 1987.  In 1995, he wrote a book entitled '*Unsportsmanlike Conduct-Exploiting College Athletes*,' in which Byers details the history behind the restraint challenged in this Complaint.  This history belies Defendants' expected and alleged "procompetitive" justifications for their collusive suppression of the value of athletics grant-in-aid.

271.  Mr. Byers documented that the artificially-low cap on value provided to college athletes in return for their services was not born from a purpose of preserving amateurism.  Nor from any plan to stimulate product output, product quality, or consumer demand.  Quite to the contrary, the grant-in-aid cap is a cost-saving measure,

---

[29]  NCAA Licensing Program FAQs (http://www.ncaa.org/championships/marketing/ncaa-licensing-program-faqs).

[30]  *Id.*

[31]  Koba, Mark, "*How College Athletes Could End Up Getting Paid Like Pros*," CNBC, Feb. 3, 2013 (http://www.cnbc.com/id/100420450).

period.   Moreover, the device created to provide limited payment to collegiate athletes—the GIA—was not conceived with a fidelity to any education mission. Rather, it was devised as a mechanism to avoid legal liability under labor and workers' compensation laws.  As described in Mr. Byers' book:

- "In the late 1940s, I was one of a small group that patched together the diverse interests of college athletes into a body politic, the modern National Collegiate Athletic Association.  I then became the NCAA's first full-time executive director and, until my retirement in 1987, its only one.  I was charged with the dual missions of keeping intercollegiate sports clean while generating millions of dollars each year as income for the colleges."  Byers, Unsportsmanlike Conduct-Exploiting College Athletes (1995), p. 5.

- "[D]own the years I had negotiated nearly 50 sports television contracts that piled multimillion-dollar deals one atop of another— money that funneled directly to the colleges. …As the rewards multiplied, unanswered contradictions quickly followed." *Id* at 9.

- "Today, the NCAA Presidents Commission is preoccupied with tightening a few loose bolts in a worn machine, firmly committed to the neoplantation belief that the enormous proceeds from college games belong to the overseers (the administrators) and supervisors (coaches).  The plantation workers performing in the arena may receive only those benefits authorized by the overseers. This system is so biased against human nature and simple fairness in light of today's high-dollar, commercialized marketplace that the ever increasing number of primary and secondary NCAA infractions cases of the 1990s emerge in the current environment as mostly an indictment of the system itself." *Id* at 2-3.

- "In an unpublicized written memo to the top NCAA management group [in 1985], I said full-need student-athletes should be given additional financial assistance over the permitted grant-in-aid.  The memo said: 'I earnestly hope that the membership does not take a righteous stand in favor of old-time amateur principles for the athlete, but modern-day commercial involvement for coaches and institutions, and somehow expect a relatively small NCAA enforcement crew to keep the situation clean.'  …All I accomplished with those efforts was a hardening of the NCAA position on 'amateurism.'  Players must be shielded from exploitation and the taint of commercial gold, the NCAA officially

reiterated in the early 1990's, and it then confirmed that the gold belonged to the coaches and the colleges." *Id* at 13.

- "As the enormous financial rewards for winning expanded during the 1960s and multiplied in the 1970s and 1980s, NCAA enforcement never kept pace and the effectiveness of conference commissioners as regulators and enforcers became virtually non-existent." *Id* at 40.

- "[In the early 1950s, opponents of grants-in-aid not tied to financial need] labeled the emerging grant-in-aid systems 'pay for play.'  These arguments became muted, however, as more and more colleges went to grant-in-aid funding to meet the competition.  It was then that they came face to face with a serious, external threat that prompted most of the colleges to unit and insist with one voice that, grant-in-aid or not, college sports still were only for 'amateurs.'  That threat was the dreaded notion that NCAA athletes could be identified as *employee*s by state industrial commissions and the courts." *Id* at 69.

- "[In response to the workers' compensation concern,'] We crafted the term *student-athlete*, and soon it was embedded in all NCAA rules and interpretations as a mandated substitute for such words as players and athletes.  We told college publicists to speak of 'college teams' not football or basketball 'clubs,' a work common to the pros." *Id.*

- "In 1956, the colleges, acting through the NCAA in the name of 'amateurism,' installed their own pay system called the athletics grant-in-aid or athletics 'scholarship.' *Id* at 65.

- [In 1957, the NCAA defined allowable grant-in-aid expenses] "as tuition, fees, room and board, books and $15 per month for nine months for laundry money.  This compensation package represented an arbitrary but uniquely lucrative allowance at the time, all dedicated to amateurism.  The rationale was that if a player received only expenses, even though it was more than other students received, he was not being paid to perform." *Id* at 72.

- "The accounting variable in college athletics make it difficult if not impossible to know whether a big-time sport pays for itself, much less whether it generates net receipts to finance the deficit sports. …Do *any* major sports programs make money for their universities?  Sure, but the trick is to overspend and feed the myth that even the industry's plutocrats teeter on insolvency." *Id* at 221, 224.

- 93 -

- "The original grant-in-aid concept of the mid-1950s had allowed for $15 per month laundry money.  The rule was expanded in time to include course-related supplies.  These extra benefits were eliminated by subsequent NCAA economy actions, and this irritated the bigger schools almost to the same degree as the ban on travel uniforms.  Repeated efforts were mounted to reestablish a monthly case stipend, many arguing it should be $50.  These initiatives were averted…." *Id* at 236.

- "College athletics reform movements spanning almost 90 years have been remarkably consistent.  They never reformed much of anything.  For nearly 40 of those years, I was part of those visionary efforts that came to naught.  We seemed to be constantly chasing the horse after it had escaped from the barn." *Id* at 337.

- "Spectators following the college 'reform' game need a scorecard to keep track of the many measures that have carried the promise of change.  My tally sheet shows only a few major engagements, and even in these the changes were only temporary." *Id.*

- "The Olympics, bellwether of amateurism for half a century, now permits athletes to escrow big dollars and still compete for the gold.  NBA greats form the nucleus of the U.S. Olympic basketball team.[32]  The colleges, meanwhile, have expended their control of athletes in the name of amateurism—a modern-day misnomer for economic tyranny.  These regulations, like procrustean laws, require all athletes to conform." *Id* at 347.

- "Pleading hard times and a desperate need for money is standard disinformation pumped out by the biggest colleges." *Id* at 357.

---

[32]   The same is true of the U.S. Olympic women's basketball team which, in 2012, was made up *entirely* of current players in the WNBA, led by a trio of two-time Olympic gold medalists – Sue Bird (Seattle Storm), reigning league Most Valuable Player Tamika Catchings (Indiana Fever), and 2009 MVP Diana Taurasi (Phoenix Mercury).  Bird, Catchings, and Taurasi all were members of the 2004 U.S. team that won the gold medal in Athens and the 2008 squad that brought home the gold from Beijing in 2008.  Other returnees from the gold-medal winning 2008 U.S. Olympic Team included 2011 WNBA Finals MVP Seimone Augustus (Minnesota Lynx), 2011 WNBA Defensive Player of the Year Sylvia Fowles (Chicago Sky), and 2008 league MVP Candace Parker (Los Angeles Sparks). Swin Cash (Chicago Sky) served as another member of the 2012 U.S. team to already own a gold medal, having earned hers with the 2004 U.S. team. First-time Olympians for the 2012 U.S. women's basketball team included Maya Moore and Lindsay Whalen (both of the Minnesota Lynx), Tina Charles and Asjha Jones (teammates with the Connecticut Sun), and Angel McCoughtry (Atlanta Dream).   http://www.wnba.com/news/ _38_current__former_wnba_ pl_2012_07_26. Html.

---

- "I believe the record now clearly shows the major hope for reform lies outside the collegiate structure.  What the colleges will not do voluntarily should be done for them." *Id* at 369.

- "Collegiate amateurism is not a moral issue; it is an economic camouflage for monopoly practice." *Id* at 376.

- "[P]rotecting young people from commercial evils is a transparent excuse for monopoly operations that benefit others.  The colleges do take part in trusts (i.e., groups in which control of the members is vested in a single entity), combinations (as association of firms for a commercial purposes), and monopoly practices (exclusive control of a commodity or service)." *Id* at 388.

- "Prosecutors and the courts, with the support of the public, should use antitrust laws to break up the collegiate cartel…. *Id*.

- "[The NCAA's 512 pages of] rules, based on a turn-of-the-century theory of amateurism, enforce a modern economic order.  Today's educational reformers seem increasingly content to engage in a pedantic tautology.  Players may not receive money, except what we give them, because they must remain amateurs to be eligible under our rules.  They are amateurs if our rules say they are.  Thus, they may only receive what our rules permit." *Id* at 390.

- "[T]he college player cannot sell his own feet (the coach does that) [via shoe endorsement deals] nor can he sell his own name (the college will do that).  This is the plantation mentality resurrected and blessed by today's campus executives." *Id* at 391-92.

- "A meeting among business competitors to harmonize their bids on a contract is usually called a conspiracy.  More than 900 members agreeing to a contract through the NCAA to issue common contracts to young people recruited to play on various sports teams seems to fit that niche." *Id* at 391.

- "Since the same college people who harvest the returns set the rules, issue the interpretations, rule on athletes' eligibility, and decide how the annual profits should be divided, I believe state and federal challenges to these artificial restraints will be necessary." *Id* at 392.

**I.    Reality of College-Athlete Life**

272.    Two Michigan State University law professors, Robert A. McCormick and Amy Christian McCormick, recently conducted a study regarding Division I

athletes in the revenue generating sports, and concluded that those athletes' "daily burdens and obligations not only meet the legal standard of employee, but far exceed the burdens and obligations of most university employees."

273.   After they spend their college years juggling athletic and academic requirements, many college athletes wind up substantially in debt because their scholarships did not fully cover the basic necessities of life. A recent study illustrated that so-called "full scholarships" can leave college athletes with as much as $30,000 in normal student expenses uncovered over the course of their collegiate athletic careers.

274.   College athletes, including specifically, Division I Women's Basketball players, often spend 30-60 hours per week in practice, team meetings, travel and official games during the season, and many hours per week in athletics-related activities, such as recruitment, even during the off season. During the most recent NCAA annual meeting in San Diego, NCAA President Mark Emmert stated "... in Division 1 where, you know, student-athletes in some sports are putting in 30-to-40 hours a week, well that's a full time, uh, commitment, ...."[33] Although NCAA rules theoretically restrict the time college athletes may spend on their sport to 20 hours per week, the NCAA rules contain a large loophole for so-called "voluntary" workouts that do not count toward the limit and which college athletes understand to be mandatory in the eyes of their coaches.

275.   Because of the tremendous time commitment required to participate in major college sports, as well as NCAA and institutional rules in force during portions of the Class Period that precluded college athletes from working part-time jobs during the school year, college athletes generally are unable to earn additional money from part-time jobs during the school year.

---

[33] See it on video here, where he almost says "job" before changing it to "commitment." http://www.youtube.com/watch?v=02aKLJzsV2k&feature=player_detailpage#t=2254.

276. The overwhelming majority of Division I Women's Basketball players do not turn professional.[34] Those that do turn professional typically do not remain professionals for very long.

277. There is no question that the grant-in-aid cap is in effect an agreement to fix wages.

278. Any empirical observation of student-athletes' daily activities shows that student-athletes are closely akin in practice to traditional workers.[35] For example, "a self-study performed by the NCAA in 2011" found that "Division I [college] football players [devoted] an average of 43.3 hours per week to their sport" – more time than they spent on academic activities, and more than a typical U.S. worker spends on his profession. In addition, student-athletes seem to meet the Internal Revenue Service's multifactor test for employment because NCAA coaching staffs exercise year-round behavioral controls over student-athletes and impose strict limits on their outside financial activities. Furthermore, in the context of workers' compensation law, at least one court has issued an award to a student-athlete – thus treating him as a *de facto* employee.

279. All of these factors combine to significantly rebut the longstanding legal fiction advanced by the NCAA that student-athletes are foremost students and not workers. Indeed, there is even some evidence that this legal fiction was created by the NCAA for the specific purpose of trying to avoid antitrust scrutiny.[36] Thus, it would

---

[34] According to the National Association for Sport and Physical Education, one out of 5,000 women's high school basketball players, or .02 percent, are drafted into the WNBA.

[35] *See generally* Robert A. McCormick & Amy Christian McCormick, The Myth of the Student-Athlete: The College Athlete As Employee, 81 WASH. L. REV. 71, 129 (2006) (highlighting the argument made by some that student-athletes cannot be victims of wage fixing because they are not employees).

[36] *See* McCormick & McCormick, supra n.71, at 74 (arguing that the NCAA self-coined the term "student-athlete" to perpetuate a myth of amateurism and "obtain the astonishing pecuniary gain and related benefits of the athletes' talents, time, and energy").

be the most cynical of loopholes to allow the NCAA to evade antitrust scrutiny simply by applying a dubious label to their business practices.[37]

### J.   Defendants' Likely Affirmative Defenses Do Not Apply

280.   The NCAA in other antitrust litigation has articulated various affirmative defenses.  If Defendants assert them in this case, these alleged defenses lack adequate factual and legal support, and do not excuse Defendants' violation of the Sherman Act and other laws.

#### 1.   The notion of amateurism is a façade.

281.   There exists a broad consensus among economists and professors of sports management that "amateurism" as the NCAA defines it, is really just a façade to cover up what amounts to the monopolization of the industry via a cartel, and collective price-fixing. This literature includes the popular press, published academic articles, and textbooks.

#### 2.   "Amateur College Athletics" and "Division I Women's Basketball" will continue to exist.

282.   The NCAA has asserted in another antitrust litigation an alleged affirmative defense that "the NCAA's financial aid, eligibility, and amateurism bylaws and rules promote the creation and enhancement of amateur college athletics as 'products' or activities that are distinct from professional and other amateur athletics. The NCAA's financial aid rules accordingly allow the creation and maintenance of a 'product' – amateur college athletics – that would otherwise not exist, and are accordingly procompetitive."

283.   Plaintiffs here do not seek any relief that significantly impacts an alleged product of "amateur college athletics." For example, even within the NCAA's structure, hundreds of college women's basketball teams exist which compete in

---

[37] *See generally Am. Needle, Inc. v. NFL,* 130 S. Ct. 2201, 2213 (2010) ("An ongoing § 1 violation cannot evade § 1 scrutiny simply by giving the ongoing violation a name and label.").

collegiate basketball outside of the Division I Women's Basketball league. Specifically, at the end of the 2013 season, 265 schools compete in collegiate level women's basketball in the NCAA's Division II, 325 schools compete in in women's college basketball in the NCAA's Division III, and 259 schools compete in the NAIA. "Amateur" collegiate women's basketball, even as restrictively defined by the NCAA, will continue to exist regardless of the outcome of the present litigation.

284.    Moreover, Division I Women's Basketball will continue to exist. Numerous leading, mainstream publications have published detailed analyses calling for significant change in the artificial financial aid restraints presently imposed on collegiate athletes. None of them have suggested that such changes would eliminate Division I Women's Basketball.

285.    There exists a broad consensus among economists and professors of sports management that while competitive balance may provide important pro-competitive benefits, the NCAA rules in suit with respect to the fixing of prices offered to athletes across Division I do not contribute to competitive balance and may, in fact, harm it. *See, e.g.,* Peach, Jim, "College Athletics, Universities, and the NCAA," The 2006 Western Social Science Association Presidential Address, available at http://www.suu.edu/faculty/berri/PeachNCAA2007.pdf (last visited April 10, 2014).

286.    The modern Olympics provide a prime, analogous example of a change in athlete compensation practices not negatively impacting sports fans' enjoyment of a product. On July 25, 2012, The Atlantic published a detailed article entitled 'The Olympics Show Why College Sports Should Give Up on Amateurism.' It's author, Patrick Hruby, an award-winning sports journalist, wrote as follows:

> Things were falling apart. The system would not hold. For decades, it had clung to the amateur ideal, enforced by a watchful governing body: Athletes could not receive material gain, directly or indirectly, for playing sports.
>
> Only the cash came anyway, in drips and drabs and great big gushers, mostly under the table, the public's insatiable demand for spectacle

rushing to meet a limited supply of talented performers. Some decried the resulting corruption and hypocrisy: others lambasted the unfairness of it all. Prominent voices demanded wholesale change. Still, amateurism's defenders held fast, with one telling Sports Illustrated that "'if we water down the rules now, the [sport] will be destroyed within eight years.'"

The above does not describe the National Collegiate Athletic Association and contemporary big-time college sports.

The year was 1960. The subject was the Olympics. Once upon a time, the Games were an amateur affair, as committed to no-pay-for-play—no salaries, not endorsements—as today's NCAA. Of course, that was before International Olympic Committee head Juan Antonio Samaranch pushed for the inclusion of professional athletes. And before basketball's 1992 Dream Team. And before a bevy of pros in everything from track and field to table tennis—in short, the world's best—flooded the Games.

Yet on the way to a grubby Gomorra of unfettered sports commerce, a funny thing happened: The watered-down Olympics didn't exactly sink to the bottom of Marianas Trench.

"Dead in eight years?" said Olympic historian Bill Mallon, who has written dozens of books about the Games in a recent interview. "If anything, the Olympics are more popular and powerful than ever. It has been decades since they opened up the Games to the professionals, and they're still going strong."

287. Similarly, just as artificial restraints on the compensation of Olympic athletes did not eliminate the Olympics, changes to the artificial restraints on financial aid for Division I Women's Basketball players will not eliminate Division I Women's Basketball, nor "amateur [women's] college basketball," nor "amateur athletics."

### 3.      Competitive balance will not be impacted.

288.    Elsewhere, the NCAA has asserted as an alleged affirmative defense that "[i]n addition to enabling the creation of amateur college sports, the NCAA rules promote the creation and maintenance of several unique features of NCAA college athletics, including: They promote competitive balance between and among NCAA member institutions in the various sports in which they compete ...." In actuality, competitive balance does not even presently exist across all NCAA member institutions. As Defendant Pac 12 Commissioner Larry Scott stated in 2011, "I don't

think there is an even playing field," Scott said. "There's not an even playing field in TV exposure. There's not an even playing field in coaches and coaches' salaries. There's not an even playing field in stadiums."

289.   An academic piece by Rodney D. Fort, published in Sports Economics (2d ed. 2005), similarly concludes:

> Just as with pro leagues, a cursory analysis reveals that none of the restrictions on players actually have anything to do with competitive imbalance.  Instead, they transfer value produced by players away from players and toward the athletic department.  *Id* at 492.

> ***

> Interestingly, many believe that these restrictions create a level playing field that enables the poorer athletic departments to compete with richer ones for talent.  Nothing could be farther from the truth.  Instead, these restrictions entrench power at departments at the top end of the winning percent distribution.  *Id* at 495.

### 4.     Education will remain a condition of athletic eligibility

290.   Elsewhere, the NCAA has asserted as an affirmative defense that its financial aid rules "help to insure that student-athletes are integrated into the student body as a whole and that education remains an important component of the student-athlete experience." In the present litigation, any such affirmative defense is a non-starter. Plaintiffs here does not challenge any rules or regulations that require Class members to be students in good standing at their respective academic institutions.

## INTERSTATE TRADE AND COMMERCE

291.   The business activities of Defendants that are the subject of this action are within the flow of, and substantially affect, interstate trade and commerce.

292.   During the Class Period, Defendants transacted business in multiple states in a continuous and uninterrupted flow of interstate commerce throughout the United States.

293.   As alleged in this Complaint, Defendants and their member institutions cap "full" athletic scholarships below Cost of Attendance, or the price tag that each

school reports to the U.S. Department of Education, leaving college athletics scholarship recipients with out-of-pocket education-related expenses.   These same colleges are free to *give academic* scholarships that fully cover the Cost of Attendance while their "full" *athletic* scholarships must fall short of the Cost of Attendance by agreement among Defendants.

## CLASS ACTION ALLEGATIONS

294.   Plaintiffs bring this action as a class action under Rules 23(a), 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class:

> All persons who received athletic grants-in-aid ("GIAs") for participation in women's college basketball from a college or university that is a member of the NCAA's Division I conferences any time between March 5, 2010 and the date of judgment in this matter (hereinafter the "Women's Division I Basketball Class" or simply, the "Class").

295.   Excluded from the Class set forth above are all Women's Division I Basketball players that, during the Class Period, played for any school in the Ivy League or any of the Service Academies.   The Ivy League consists of Brown University, Columbia University, Cornell University, Dartmouth University, Harvard University, Princeton University, the University of Pennsylvania and Yale University. Ivy League schools do not offer athletics Grants-in-Aid.   The Service Academies refer to the United States Military Academy ("Army"), the United States Naval Academy ("navy") and the United States Air Force Academy ("Air Force").   The Service Academies do not offer athletics Grants-in-Aid.

296.   The Class is so numerous that joinder of all members is impracticable. While the exact number of the class members is unknown to Plaintiffs at this time prior to discovery, Plaintiffs believe that there are several thousand Class Members.

297.   Plaintiffs' claims are typical of the claims of the other members of the Class. Plaintiffs and other class members sustained damages arising out of Defendants'

common course of conduct in violation of law as complained herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct as alleged herein.

298. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

299. Common questions of law and fact exist as to all members of the Class, and these common questions predominate over any questions affecting only individual members of the Class. In many instances, Defendants admit that they have engaged in the conduct alleged in this Complaint. Among the questions of law and fact common to the Class are:

    a. Whether Defendants combined or conspired to unreasonably restrain trade by limiting the monetary amount of grants-in-aid given to the Class;

    b. Whether such conduct caused members of the Class to receive less in grants-in-aid than they would have in a competitive market;

    c. Whether Plaintiffs and other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for the Class; and

    d. Whether the Class is entitled to, among other things, injunctive relief, and if so, the nature and extent of such injunctive relief.

300. Defendants have acted in a manner applicable to the Class, thereby making final injunctive relief appropriate for the Class as a whole.

301. Plaintiffs' claims are typical of those of members of the Class because the cap on grants-in-aid has injured both Plaintiffs and the members of the Class.

302.   Plaintiffs are adequate representatives of the Class and will protect the claims and interests of the Class. Plaintiffs do not have interests that conflict with those of the Class. Plaintiffs will vigorously prosecute the claims alleged herein and have retained competent counsel with extensive antitrust and class action litigation experience.

303.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.

304.   The interest of members of the Class in individually controlling the prosecution of separate actions is theoretical rather than practical. The Class has a high degree of cohesion, and prosecution of the action through representatives would be unobjectionable. The amounts at stake for class members, while substantial in the aggregate, are not great enough individually to enable them to maintain separate suits against Defendants. Plaintiffs do not anticipate any difficulty in the management of this action as a class action.

## ANTITRUST ALLEGATIONS

305.   Defendants' combination and conspiracy described herein consists of a continuing horizontal and vertical agreement, understanding, and concert of action among the Defendants and their co-conspirators, the substantial terms of which are to artificially fix, depress, maintain, and/or stabilize amounts paid to Plaintiffs and class members for their collegiate athletic services in the United States, its territories and possessions.

306. In formulating and effectuating the combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things:

a. Agreeing to artificially fix, depress, maintain, and/or stabilize amounts paid to Plaintiffs and class members for their collegiate women's basketball athletic services; and

b. Implementing and monitoring the conspiracy among cartel members.

307. The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, depress, maintain and/or stabilize amounts paid to Plaintiffs and class members for their collegiate women's basketball athletic services.

308. Defendants' actions constitute an unreasonable restraint of trade.

309. As a result of Defendants' unlawful actions as alleged in this Complaint, Plaintiffs and the Class have suffered antitrust injury and damages in an amount to be determined, and will continue to do so unless Defendants are enjoined.

**FIRST CLAIM FOR RELIEF**
**PER SE VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**(Against All Defendants)**

310. Plaintiffs reallege and incorporate by reference each allegation set forth in this Complaint.

311. Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the relevant market, including the Conference Defendants, have engaged and continue to engage in a combination and conspiracy, through the cap on grants-in-aid, to fix the amount of financial aid and awards available to class members and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

312. This combination and conspiracy, organized and coordinated through the NCAA, which possesses a dominant position in the relevant market, has produced and, unless restrained, will continue to produce, the following anti-competitive effects, among others:

    a.    competition in the amount, terms and conditions of financial aid and awards to class members at NCAA member institutions that compete in the Division I Women's Basketball Labor Market has been and will continue to be unreasonably restricted and artificially eliminated; and

    b.    Class members have been and will continue to be deprived of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions that compete in the Division I Women's Basketball Labor Market.

313. As a direct and proximate result of Defendants' actions, Plaintiffs and the members of the Class have suffered antitrust injury and have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

314. The NCAA and its members' abridgement of class members' economic rights are a per se restraint of trade.

315. The amount of damages suffered by Plaintiffs and the members of the Class has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs are entitled to recover from Defendants treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

316. Plaintiffs and class members are entitled to a declaratory judgment declaring as void and unenforceable the NCAA Bylaws referenced herein that cap the value of grants-in-aid.

317.    Plaintiffs and the Class are entitled to a permanent injunction that enjoins Defendants from engaging in the ongoing violations described in this Complaint.

318.    Plaintiffs and the Class are further entitled to relief in the form of appointment of an External Antitrust Compliance Monitor detailed herein.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNREASONABLE RESTRAINT OF TRADE**
**"QUICK LOOK" RULE OF REASON ANALYSIS**
**(Against All Defendants)**

319.    Plaintiffs reallege and incorporate by reference each allegation set forth in this Complaint.

320.    If the Court determines that Defendants' conduct does not constitute, in whole or in part, a per se antitrust violation as alleged in Plaintiff's First Claim For Relief, Plaintiffs alternatively plead that Defendants' conduct, as analyzed in whole or in part via the "quick look" rule of reason antitrust analysis, violates the Sherman Act. The anti-competitive nature of Defendants' agreement is so blatant that a detailed review of the surrounding marketplace is unnecessary. Under this analysis, as the Supreme Court has stated, "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anti-competitive effect on customers and markets." Those words equally apply to the present case.

321.    Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the Division I Women's Basketball Labor Market, including the Conference Defendants, have engaged and continue to engage in a combination and conspiracy, through the cap on grants-in-aid, to fix the amount of financial aid and awards available to Plaintiffs and class members and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

322. This combination and conspiracy, organized through the NCAA, which possesses a dominant position in the relevant market, has produced and, unless restrained, will continue to produce, the following anti-competitive effects among others:

      a.     competition in the amount, terms and conditions of financial aid and awards to class members at NCAA member institutions that compete in the Division I Women's Basketball Labor Market has been and will continue to be unreasonably restricted and artificially eliminated; and

      b.  Plaintiffs and class members have been and will continue to be deprived of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions that compete in the Division I Women's Basketball Labor Market.

323. As a direct and proximate result of Defendants' actions, Plaintiffs and the Class have suffered antitrust injury and have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

324. Defendants' abridgement of Plaintiffs' and class members' economic rights are a restraint of trade, and are not connected to any legitimate non-commercial goals. The purpose of the NCAA's and its members' actions is solely to enhance revenue for themselves by cutting costs, specifically, to eliminate the need to compete, and to pay any compensation to Plaintiffs and class members above the artificially depressed, capped grant-in-aid limit.

325. The anti-competitive effects of Defendants' scheme substantially outweigh any alleged pro-competitive effects or justifications that may be offered by Defendants, including that their collusive conduct is shielded by their self-crafted concept of "amateurism."

326.    Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

327.    The amount of damages suffered by Plaintiffs and class members has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs and the Class are entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

328.    Plaintiffs and class members are entitled to a declaratory judgment declaring as void and unenforceable the NCAA Bylaws referenced herein that cap the value of grants-in-aid.

329.    Plaintiffs and the Class are entitled to a permanent injunction that enjoins Defendants from engaging in the ongoing violations described in this Complaint.

330.    Plaintiffs and the Class are further entitled to relief in the form of appointment of an External Antitrust Compliance Monitor detailed herein.

**THIRD CLAIM FOR RELIEF**
**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNREASONABLE RESTRAINT OF TRADE**
**FULL RULE OF REASON ANALYSIS**
**(Against All Defendants)**

331.    Plaintiffs reallege and incorporate by reference each allegation set forth in this Complaint. As an alternative to Plaintiffs' First and Second Claims for Relief, if the Court determines that Defendants' conduct does not constitute, in whole or in part, a per se antitrust violation, and that Defendants' conduct should not be analyzed, in whole or in part, via the "quick look" "rule of reason" analysis, Plaintiffs alternatively pleads that Defendants' conduct, as analyzed in whole or in part via the full rule of reason antitrust analysis, violates the Sherman Act.

332.    Throughout the Class Period, and continuing through the resolution of this case, the NCAA and its member institutions participating in the Division I Women's Basketball Labor Market, including the Conference Defendants, have engaged and continue to engage in a combination and conspiracy, through the cap on

grants-in-aid, to fix the amount of financial aid and awards available to Plaintiff and class members and otherwise unreasonably restrain competition in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

333. This combination and conspiracy, organized through the NCAA, which possesses a dominant position in the relevant market, has produced and, unless restrained, will continue to produce, the following anticompetitive effects among others:

a. competition in the amount, terms and conditions of financial aid and awards to Plaintiffs and class members at NCAA member institutions that compete in the Division I Women's Basketball Labor Market has been and will continue to be unreasonably restricted and artificially eliminated; and

b. Plaintiffs and class members have been and will continue to be deprived of the benefits of competition as to the amount, terms and conditions of grants-in-aid from NCAA member institutions that compete in the Division I Women's Basketball Labor Market.

334. As a direct and proximate result of Defendants' actions, Plaintiffs and class members have suffered antitrust injury and have been, are being, and will continue to be, injured and financially damaged in amounts which are yet to be determined.

335. The NCAA and its members' abridgement of Plaintiffs and class members' economic rights are a restraint of trade, and are not connected to any legitimate non-commercial goals. The purpose of Defendants' actions is solely to enhance revenue for themselves by cutting costs, specifically, to eliminate the need to

COMPLAINT

compete, and to pay any compensation to Plaintiffs and class members above the artificially depressed, capped grant-in-aid limit.

336. The anti-competitive effects of Defendants' scheme substantially outweigh any alleged pro-competitive effects or justifications that may be offered by Defendants, including that their collusive conduct is shielded by their self-crafted concept of "amateurism."

337. Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

338. The amount of damages suffered by Plaintiffs and class members has not yet been ascertained. Pursuant to Section 4 of the Clayton Act, Plaintiffs and class members are entitled to recover from the NCAA treble the amount of actual damages as well as an award of reasonable attorneys' fees and costs of suit.

339. Plaintiffs and class members are entitled to a declaratory judgment declaring as void and unenforceable the NCAA Bylaws referenced herein that cap the value of grants-in-aid.

340. Plaintiffs and the Class are entitled to a permanent injunction that enjoins Defendants from engaging in the ongoing violations described in this Complaint.

341. Plaintiffs and the Class are further entitled to relief in the form of appointment of an External Antitrust Compliance Monitor detailed herein.

**FOURTH CLAIM FOR RELIEF**
**VIOLATION OF THE UNFAIR COMPETITION ACT,**
**CALIFORNIA BUSINESS & PROFESSIONS CODE § 17200, et seq.**
**(Against the NCAA and the PAC 12)**

345. Plaintiffs reallege and incorporate by reference each allegation set forth in this Complaint. This Count is asserted on behalf of a subclass of Women's Division I Basketball players who attended a Conference Defendant school in California and who received full grants-in aid.

342. On September 27, 2012, California's Governor signed into law California State Senate Bill No. 1525, the "Student Athlete Bill of Rights," which states, in part, that "[t]he Legislature finds and declares all of the following:

    a.  Meeting the educational needs of student-athletes should be a priority for intercollegiate athletes;

    b.  California's institutions of higher education that participate in Division I and Division II intercollegiate athletics collectively generate millions of dollars annually in media contracts, and this revenue would not exist without the efforts of student-athletes;

    c.  Student-athletes generate large revenues for many athletic programs, spend approximately 40 hours per week participating in their respective sports, and suffer current and historically low graduation rates;

    d.  Providing adequate health and safety protection for student-athletes can help prevent serious injury and death;

    e.  Current and former student-athletes can be left to pay for medical expenses incurred from injuries suffered while participating in intercollegiate sports; and

    f.  Institutions of higher education should provide their student-athletes with the same due process afforded to students who do not participate in athletics."

343. Defendants' conduct and unlawful conspiracy, as alleged above, constituted and constitutes unfair, unlawful and/or fraudulent business practices in violation of Section 17200 et seq., of the California Business and Professions Code. The conduct is unfair, unlawful and/or fraudulent because, among other things, it violates the federal Sherman Act.

344. Moreover, Defendants' conduct is unfair in that it violates the policy and spirit of the California Student Athletes' Bill of Rights, as well as the policy and spirit of federal antitrust law. Defendants' conduct, in depriving Plaintiffs and class members of basic economic rights, is directly at odds with California's policy of protecting the well-being of California's college athletes.

345. As a direct result of Defendants' conduct and violations of federal antitrust and other laws described herein, Plaintiffs Hartman and Jemerigbe were injured in their business or property in an amount to be proven at trial.

346. Defendants' conduct has further caused and is causing damage and irreparable injury to Plaintiffs and class members. Plaintiffs and class members are accordingly entitled to disgorgement of Defendants' profits and injunctive relief, plus interest and attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5 and request the following injunctive relief: (a) that Defendants be ordered to cease and desist from continuing to unlawfully depress the potential financial aid and awards available to Plaintiffs and class members; and (b) that Defendants disgorge all their profits obtained from the abridgement of Plaintiffs' and class members' economic rights as described herein.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF § 1 OF THE SHERMAN ACT, 15 U.S.C. § 1**
**UNREASONABLE RESTRAINT OF TRADE**
**GROUP BOYCOTT/REFUSAL TO DEAL**
**(Against All Defendants)**

347. Plaintiffs reallege and incorporate by reference each allegation set forth in this Complaint.

348. Defendants and their co-conspirators, by and through Defendants' and co-conspirators' officers, directors, employees, agents or other representatives, entered into a continuing contract, combination and conspiracy in restraint of trade to effectuate a group boycott of class members. Defendants' group boycott/refusal to deal encompasses Defendants' concerted refusal to pay class members the full cost of

- 113 -

their attendance, in the United States and its territories and possessions, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

349. Plaintiffs and the members of the Class received less than they otherwise would have received for their labor in a competitive marketplace, were thus damaged, and seek to recover those damages.

350. On information and belief, the NCAA always conditions eligibility to play NCAA Division I College Women's Basketball on the class member's agreement to abide by the rules and regulations of the NCAA, including those prohibiting the offer or acceptance of payment from any institution of amounts in excess of their grants-in-aid. Member institutions comply with such rules under threat of sanction from the NCAA, up to and including expulsion from the NCAA.

351. Defendants and their co-conspirators' abridgement of compensation rights for current and former student-athletes are not connected to any legitimate non-commercial goal. Defendants' actions are solely to enhance revenue for themselves and for their for-profit business partners by cutting costs, to eliminate the need to compete, and to pay compensation to Plaintiffs and class members above the artificially depressed, capped grant-in-aid limit. Defendants' actions have no relationship to any of the alleged goals of "amateurism" or pro-educational purposes. Thus, the NCAA's actions directly regulate a commercial market and therefore are illegal.

352. As a direct and proximate result of Defendants' group boycott, Plaintiffs and the members of the Class have been injured and financially damaged in amounts which are presently undetermined. Plaintiffs' and class members' injuries consist of denial of compensation in excess of the amounts permitted by NCAA rules. Plaintiffs and class members' injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

353. The anticompetitive effects of Defendants' group boycott substantially outweigh any alleged pro-competitive effects that may be offered by Defendants,

including that their collusive conduct is shielded by its concept of "amateurism" or pro-educational purpose.

354. Reasonable and less restrictive alternatives are available to Defendants' current anticompetitive practices.

355. Plaintiffs and class members are entitled to a declaratory judgment declaring as void and unenforceable the NCAA Bylaws referenced herein that cap the value of the grants-in-aid.

356. Plaintiffs and class members are entitled to a permanent injunction that terminates the ongoing violations alleged in this Complaint.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs and the members of the Class request judgment against Defendants as follows:

A. For actual damages according to the proof at trial;

B. For treble damages pursuant to 15 U.S.C. § 15;

C. For a declaratory judgment declaring as void the NCAA's Bylaws that operate to impose a cap on grants-in-aid that NCAA members may provide;

D. For an injunction restraining Defendants from enforcing their unlawful and anticompetitive agreement to cap the amount of financial aid available to class members;

E. For the attorneys' fees, costs and expenses of Plaintiffs and the Class;

F. For the appointment of an Antitrust Compliance Monitor; and

G. For such other relief that the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs on behalf of themselves and all others similarly situated hereby

request a jury trial on any and all claims so triable.

DATED:  January 13, 2015                    **PRITZKER LEVINE LLP**

                                    By: _____
                                         Elizabeth C. Pritzker (SBN: 146267)

                                    Jonathan K. Levine (SBN:  220289)
                                    Bethany L. Caracuzzo (SBN: 190687)
                                    Shiho Yamamoto (SBN: 264741)
                                    180 Grand Avenue, Suite 1390
                                    Oakland, California 94612
                                    Telephone:  (415) 692-0772
                                    Facsimile:   (415) 366-6110
                                    Email:  ecp@pritzkerlevine.com;
                                            jkl@pritzkerlevine.com
                                            bc@pritzkerlevine.com;
                                            sy@pritzkerlevine.com

                                    Attorneys for Plaintiffs Justine Hartman and
                                    Afure Jemerigbe

COMPLAINT